In the Matter of the Estates of SOLOMON SCHINASI and BETTI SCHINASI, Deceased.

Surrogate's Court, New York County, February 24, 1931.

*Maurice Rose,* for the petitioner.

*Chadbourne, Stanchfield & Levy* [*George W. Whiteside* and *J. Arthur Leve* of counsel], for the respondents.

*Joseph D. Nunan,* special guardian.

O'BRIEN, S.   These are two applications made by Nettie Schratter Stoeve for letters testamentary with the wills annexed in the above-named estates.   Petitioner seeks the issuance of those letters to enable her, after their issuance, to bring actions against said estates as represented by such administrators with the wills annexed, which actions are to be predicated upon petitioner's claim, described by her attorney in the following language: " The petitioner's claim is for breach of a contract entered into in 1908 between herself and both decedents, whereby the decedents informally adopted the petitioner as their daughter, agreed and guaranteed that either or both would bequeath to the petitioner one-half of their estates, to the end that there should be an equal division thereof between said Leon Schinasi and the petitioner.   Said Leon Schinasi, deceased, had actual knowledge of this contract from the time of its inception and knew of the petitioner's claim when letters testamentary were issued to him herein.   There was never a judicial settlement in either estate.   No proof of claim was filed with said deceased executor.   The sole purpose of the petitioner in having the administrator c. t. a. appointed is to make him a party defendant in the action to be instituted by her in the Supreme Court, New York County, to recover damages for said breach of contract."

As the chronology of certain facts involved in these applications is of vital importance, it is referred to at the outset of this opinion. The date of the alleged contract is in 1908.   Solomon Schinasi died on October 4, 1919.   His last will and testament was admitted to probate on October 15, 1919.   Betti Schinasi, his widow, died February 28, 1926, and her last will and testament was admitted to probate on April 5, 1926.   Leon Schinasi, son and only surviving child of these decedents, who was named in their wills as sole executor and residuary legatee, died August 16, 1930.   At the time of the alleged contract petitioner was living with her parents in Egypt.   Her mother was Betti Schinasi's sister.   It is claimed that the contract was made by numerous letters passing between Betti Schinasi and her sister, wherein decedents succeeded in having petitioner's mother allow petitioner to come to this country and live with her aunt and the latter's husband, filling the place of a daughter in the Schinasi household, in consideration of a half of the whole estate of said decedents.   There are no unadministered assets in the estate of Solomon Schinasi, but there are in the estate

of Betti Schinasi unadministered assets of approximately $5,000. It is claimed that both estates amounted to approximately $12,000,000, one-half of which is claimed by petitioner by reason of said alleged contract.

By his last will and testament Solomon Schinasi created a trust of practically his entire estate, to continue during the lives of his widow, Betti, and his son, Leon; $50,000 per annum out of the income to be paid to said widow and the balance of the income to be paid to Leon; and upon the death of either said Betti or said Leon, the whole of the income to be paid to the survivor of them; and upon the death of the survivor of them the whole of the said fund to be paid to the descendants of Leon. Further provisions were made for the distribution among certain charitable institutions of the remainder of said fund in the event that Leon should die leaving no descendants. He also made Leon Schinasi the residuary legatee of his estate.

In her last will and testament Betti Schinasi, after revoking any and all wills, codicils and papers testamentary previously executed by her, and directing that her remains be buried in Salem Hills, and that her just debts and funeral expenses be paid, gave all of her estate, real, personal and mixed, to her son, Leon Schinasi, absolutely and forever.

After the death of said Betti Schinasi and in July, 1927, petitioner brought an action against Leon Schinasi, in which she alleged an agreement upon the part of Leon Schinasi to employ her as manager, housekeeper, consultant "and in like and other capacities " for life, and " to pay her $6,000 per year for life." It was further represented that plaintiff promised to continue to live with the defendant in his home as long as he lived and to perform and render such duties as long as she lived. Plaintiff alleged performance on her part and a wrongful breach on the part of the defendant in September, 1926, and asked for damages in the sum of $218,646. In her bill of particulars she represented that the agreement was verbal and made personally between her and the defendant, and she gave further detail as to the nature and extent of the services she claimed to have rendered in the household of the defendant. This action was settled by an agreement entered into on May 7, 1930, between petitioner and her husband and Leon Schinasi. It was provided in that agreement that Leon should pay petitioner and her husband .the sum of $10,000, and should pay petitioner also the sum of $1,500 and the sum of $1,500 upon every November seventh and May seventh of every year, commencing with November 7, 1930, and ending with November 7, 1939, it being understood that no payments should be made

by Leon after the date of petitioner's death. A general release was also made in said agreement in behalf of petitioner, her heirs, executors and administrators to Leon Schinasi, Ruby Schinasi, his wife, their respective heirs, executors and administrators, and to Schinasi Commercial Corporation, said release embracing " all manner of action and actions, cause and causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims and demands whatsoever in law or in equity, which against said Leon Schinasi, Ruby Schinasi and/or Schinasi Commercial Corporation " petitioner ever had, now has, or which she, her heirs, executors or administrators shall ever have. Her husband joined in the agreement and in the release. Furthermore they both agreed in said instrument not to annoy, harass, molest, speak ill of or endeavor to communicate with Leon, his wife or their children.

I. The application should be denied as a matter of law.

(a) The petitioner is not a party in interest. She is not shown to be a creditor. Moreover, the contract claimed to have been made in 1908, eleven years before the death of Solomon and eighteen years before the death of Betti, and tardily asserted after the death of Leon, the executor and residuary legatee of the estates of both of the aforesaid decedents, is too vague, too general, too improbable, and, after analyzing carefully the whole record, too artificial to make any impression upon the mind of the court.

The affidavits presented in support of the petition were made by:

1. The petitioner herself, in which she asserts generally the story of her arrival in New York and her taking up of a residence with her aunt and her aunt's husband, and asserts " that in 1907 began a series of letters between the decedents and my parents relative to the proposal of the decedents that I be sent permanently to the decedents who desired to adopt me as their daughter to replace a deceased daughter of their own;" and she states that the letters in behalf of the decedents were written by her aunt's lady companion, Rina Cappolli, as well as by her brother Julius, " and these letters were read by my parents and were answered for my parents by my eldest sister, Bellina;" she states her mode of living during the years which she spent with both decedents, how her " uncle and aunt told me that they would consider me as their own daughter and treat me as such * * * but that they were receiving me with the understanding that I had permanently left the home of my parents and that their home was thereafter to be my home; that they expected to find in me the companionship of a daughter; that I must not expect to leave them soon, even for

the purpose of a marriage with the first man I happened to meet, and that their arrangement with me was conditional upon my agreement not to marry except with their approval. They assured me that if I carried out this arrangement on my part and devoted myself to them as a daughter so long as they would live, that they on their part agreed to leave to me one-half of their estates to the end that their estates should be divided equally between Leon and myself, in that they intended to treat Leon and myself on a par in all cases. I told them that this proposal was perfectly acceptable to me and I then and there accepted the same."

She proceeds to tell how she managed the household; she speaks about proposals of marriage that " came from suitors who declined to divide my companionship with my foster parents, who refused to permit me to marry except upon condition that my husband make his home with me in the Schinasi household, and this condition was one that not every self-supporting man would accede to. For these reasons I did not marry until October 10, 1924, when I married my husband, Hans Stoeve, who made his marriage proposal through Leon and my said deceased aunt. In compliance with these conditions, my husband and myself from the time of our marriage occupied a floor in the Schinasi household, until after the death of my deceased aunt in February, 1926." It may be noted here that the said husband, after service in the German army in the World War, came to New York in the latter part of 1921, " without any definite vocation and with an allowance from my father of approximately $100 a month," and that he was employed from 1921 to 1923 as a broker's runner at a salary of fifteen dollars a week and as a clerk in an importing house at a salary of twenty dollars a week, and was latterly engaged in the import commission business.

There is nothing asserted in the petitioner's affidavit more material or in point than the excerpts above set forth, which is of little or no value so far as its probative force is concerned. Moreover, her testimony in a trial would be barred by section 347 of the Civil Practice Act.

2. Her sister, Bellina Shratter, another interested party, who states that her mother received a number of letters from the decedents, in which they proposed that her sister Nettie should come to New York and make her home permanently with the decedents as their adopted daughter. Furthermore, she states that she read all these letters and wrote the replies thereto on behalf of her parents.

A number of the statements made in her affidavit are hearsay or would otherwise be considered objectionable upon any trial.

3. The petitioner's husband, Hans Stoeve, still another interested party, who, in nine pages embodying his affidavit, discusses at length the conversations he claims to have had with Leon about his marriage with petitioner. To a large extent, the chief purpose of the affidavit is to show what they claim Leon said about petitioner's relations through the Schinasi household and how much petitioner would inherit from the estates of his parents. He refers to conversations had with the decedent, Betti Schinasi, concerning the petitioner in which she said " that Nettie was in all respects treated and to be treated like her son Leon, not only in social matters but also in the matter of their property, that it was understood from the very beginning when Nettie arrived in the home years before that Nettie was to receive one-half of the estate of herself and husband and that she should inherit with Leon the estate on exactly equal terms." He narrates further conversations claimed to have been had with Leon concerning the arrangements to be carried out after he married the petitioner.

4. Nelle Joyce, who states that she was engaged in 1922 to marry Leon and who tells of presents he made to her of real estate, etc., of frequent visits she made to the home of the decedents and of various statements made by Leon to her concerning petitioner, and that Leon and his mother told her on several occasions that Nettie's standing in the Schinasi household was in every respect on equality with that of Leon and that the estate of the decedents was to be equally divided between Leon and petitioner, that her engagement of marriage with Leon was canceled in 1924.

5. Anna Frances Blumenthal states that she met decedents and their son in 1905, and was for many years thereafter a constant visitor at their home, and that Betti Schinasi told her she had been negotiating with her favorite sister in Egypt for her sister's child whom she proposed to adopt, that she had not visited the Schinasi household for nearly two years before 1910, in which year Mrs. Schinasi introduced the petitioner as her daughter, and that Mrs. Schinasi stated that the petitioner was to inherit equally with Leon the entire estate of herself and her husband.

6. Ephterpi (Dilopolo) Zrake, who used to do sewing for Mrs. Schinasi. She states what Mrs. Schinasi told her, deponent's sister, about sending to Egypt for petitioner for the purpose of adopting her.

7. William Zrake, a Syrian, whose mother and the Schinasi family occupied one apartment in or about 1894–1895 in a building on Moore street near Pearl street, Manhattan, the Schinasis occupying the front room where they slept, ate and rolled cigarettes. He tells about meeting the Schinasi family in their home on

Riverside drive, that Mrs. Schinasi told him that " Miss Schinasi was a daughter of her sister whom she had brought from Egypt to rear as her own daughter;" that on various occasions he addressed petitioner as " Miss Schinasi " in the presence of Mr. and Mrs. Schinasi.

8. William Croner, an employee of the Coward Shoe Company and manager of its orthopedic department, states that Solomon Schinasi purchased shoes made to order from his firm, that he visited the family for the purpose of taking the measure for shoes of Leon, and at that time Solomon Schinasi, in the presence of two others, introduced him to petitioner, saying, " This is Miss Nettie, my daughter."

9. Rina Coppolli, who states that she was a lady's companion to Betti Schinasi from the end of 1907 to 1918, that she wrote the personal correspondence for said Betti, and on occasion also for Solomon, and that she read to Betti personal letters addressed to her, that they spoke about sending for petitioner in Egypt and of adopting her, that she wrote three letters for and at the request of decedents to petitioner's mother, over a period of six months, to persuade her to send her daughter to decedents and allow her to make her home permanently with them, that she cannot remember the precise language of the letters; that they were all " to the following effect," and then she proceeds to describe in paraphrase fashion the reasons for sending for petitioner and the conditions under which petitioner came to the Schinasis; that she very definitely recalls a statement in at least one of the letters so written wherein decedents stated that their property then amounted to several millions and that the income thereof was more than sufficient for them all and " that there would be plenty left for Leon if said daughter got half of the estate." She describes the arrival of the petitioner at the Schinasi home in 1 West Eighty-fifth street and the subsequent removal of the home to Riverside drive and Eighty-ninth street, of the part played by petitioner in the household, of the proposal to petitioner of Cavalieri's brother and from a number of other gentlemen which they bade her to refuse or ignore, and of the refusal at the instance of decedents to a marriage proposal of the banker, Michael Berardini, " who, in the event of acceptance, offered to put $500,000 in petitioner's name."

10. Josephine Seroc Bennett, a waitress in the Schinasi home for six years, " between 1914 and 1920 until after a few months after the death of Mr. Solomon Schinasi." She describes conversations had with Solomon Schinasi in which he told how he came to

send for Miss Nettie " to make her his daughter," and that " as far as his property was concerned she was to receive as much as his son." Among other statements this *waitress states " he discussed intimate details regarding incidents with his wife,"* that petitioner was introduced by decedents as their daughter.

11. Julius Schratter, resident now in Tucson, Ariz., a brother of petitioner and at least to the extent of his relation to petitioner an interested party. *He came to this country in 1907, that is at a time prior to the arrival of his sister, petitioner.* He describes how decedents discussed with him the proposal to have his mother send petitioner to this country. He tells of the correspondence with his mother and decedents, and he states that decedents told them that " they would bring Nettie up as their own daughter and treat her in all respects on a par with their son Leon, and that they would give to Nettie of their property an amount equal to whatever they would give to their son Leon." He describes a conversation with Mrs. Schinasi in 1919 wherein he told the latter that " I was astonished to learn that my uncle had made no provision for Nettie in view of his promise and of my aunt's promise to divide their property equally between Leon and Nettie," etc. He describes his aunt's reply and states that she said among other remarks that " an arrangement had been made *between my uncle, my aunt and Leon* that the estate of my aunt and uncle should be left to Leon, but that Leon upon my aunt's death should give half thereof to Nettie, that they had arranged that Leon should make a will and that Leon had in fact made a will carrying out this arrangement and that by the terms of Leon's will Leon had bequeathed to Nettie an amount equivalent to one-half of what he had received and would receive from his father and mother."

Right here it should be noted that this conversation took place after Solomon Schinasi's death, when presumably the terms of his will were known to those directly interested, under which terms the bulk of the Schinasi fortune was bequeathed to the descendants of Leon as remaindermen, and if there were no descendants to various charities. Thus, in any event, neither Mrs. Schinasi nor Leon (except to the extent of $100,000 to be distributed under said will to relatives) were thereafter in any position to give, bequeath or devise a half of the Solomon Schinasi estate to petitioner, and petitioner, at the time of the admission to probate of that will, knew, or is presumed to have known, that then, if ever, she should assert any claim of a contract such as is now asserted.

The above is a fair summary of these affidavits which form the basis of the two applications now before the court.

As will readily be seen upon inspection, they are general and vague

and far from proving an actual contract upon the part of decedents with petitioner or petitioner's mother. They simply show the desire of the decedents to have a niece in their household, their affection for her and their treatment of her as one of their family and their household. They absolutely fail to show any real or reliable proof of the claims asserted by petitioner that a contract was made for her to take her place in decedents' household, live with decedents and be afterwards given one-half of all of their property.

Moreover, the petitioner has not shown with any degree of probability that her claim is well founded or that, if afforded an opportunity, she will substantiate it.

The attitude of the higher courts upon the question of opening up decrees of this court made in probate, accounting and other proceedings, is well known.

Under section 20, subdivision 6, of the Surrogate's Court Act, this court is empowered: " To open, vacate, modify, or set aside, or to enter as of a former time, a decree or order of his court; or to grant a new trial or a new hearing for fraud, newly discovered evidence, clerical error, or other sufficient cause. The powers conferred by this subdivision must be exercised only in a like case, and in the same manner, as a court of record and of general jurisdiction exercises the same powers."

In *Matter of Leslie* (175 App. Div. 108), in referring to this subject and the tests applicable, the court states: " It is not open to any one, merely by asserting a nebulous claim to an estate, to ask that a solemn decree admitting a will to probate be vacated, and a long and expensive contest be entered upon. He must first show with some degree of probability that his claim is well founded and that, if afforded an opportunity, he will be able to substantiate it. Here it is where petitioner fails."

The same court, in *Matter of Elias* (222 App. Div. 728), stated: " Facts sufficient to afford a substantial basis for contesting the will and reasonable * * * probability of success to justify the opening of a decree admitting a will to probate."

In *Matter of Lindsay* (136 Misc. 555) my learned colleague held: " The legal grounds for a vacatur, set forth in section 20, subdivision 6 of the Surrogate's Court Act, must also be established, either fraud, newly-discovered evidence, clerical error or other sufficient cause. Under the provisions of that section the power to reopen a decree must be exercised only in a case where a court of general jurisdiction (the Supreme Court) exercises the same powers. * * *

" Upon a review of all the proofs on the issue of soundness of

mind of the testator, *it is my opinion that a direction of a verdict in favor of the will would be inevitable.* (*Matter of Heaton,* 224 N. Y. 22; *Matter of Kennedy,* 229 id. 567; affd., 190 App. Div. 896, affirming direction of verdict by surrogate; *Matter of Rogers,* 127 Misc. 428; affd., 220 App. Div. 834.)"

In *Matter of Gori* (129 Misc. 541) the court said: " The motion papers in this matter were not served until March 1, 1927, so that for a period of over five months after he knew what had occurred this petitioner began no proceeding to assert his rights or to advise the court of the acts of his attorney, now alleged by him to have been performed without his consent or approval. In the meantime, this estate has been in process of administration. If this delay, under the circumstances stated in the papers, did not constitute laches fatal to this application, it at least makes it necessary that the court exercise great care before it vacates the decree and grants the other relief requested."

Right here the petitioner may contend that these rulings apply only to applications made to open up formal decrees of the court and that they do not embrace situations like that now presented, for the reason that in the administration of neither of the decedents' estates was there a formal accounting and final decree.

While it is true that the citations above refer to proceedings where there was a decree, they, nevertheless, have a direct application upon the situation now presented, where an attempt is being made to open up administrations of estates which have been closed after a due publication for debts. It is not necessary, in the administration of every estate, to have a formal accounting. (See Surr. Ct. Act, §§ 261 and 262.) This latter section specifies the persons who must be cited on an accounting and provides by subdivision 1 that creditors whose claims have been paid need not be cited, and, under subdivision 7, that devisees, legatees and so forth need not be cited where a release, duly acknowledged and proved, has been filed in this court. In a large proportion of cases where there is no direct necessity for an accounting, accounts are not filed, and so decrees on accounting are not made.

The principle involved in the above and similar decisions applies directly here, and this petitioner has not only failed affirmatively to show the semblance of substance in her claim, for which reason she must be held to be not an interested party and not a creditor, but has furthermore demonstrated that there is no prospect of success should she have a trial after the appointment of an administrator with the will annexed, as petitioned by her.

In the *first* place, whatever evidence might be adduced by her upon a formal trial would be subject to the rigorous rules applied

by the courts to cases of claims made against the estates of the dead, which were not asserted in the lifetime of the latter, which rules require the clearest and most convincing proofs.

*Second.* The petitioner's claim is of a class referred to in very definite and forceful terms in the decision of the Appellate Division, Second Department, in *Wallace* v. *Wallace* (158 App. Div. 273, 281): " Of late years there have been in the Court of Appeals a series of cases which have very clearly and positively declared the rules which must govern in determining such a claim, namely, a claim ·that a decedent made a given contract to dispose of his or her estate at death in a different manner than he or she attempted to do. (*Taylor* v. *Higgs*, 202 N. Y. 65; *Miller* v. *Hill*, 137 App. Div. 378; 203 N. Y. 646; *Tousey* v. *Hastings*, 127 App. Div. 94; 194 N. Y. 79; *Holt* v. *Tuite*, 188 id. 17; *Roberge* v. *Bonner*, 185 id. 265; *Rosseau* v. *Rouss*, 180 id. 116; *Ide* v. *Brown*, 178 id. 26; *Hamlin* v. *Stevens*, 177 id. 39; *Edson* v. *Parsons*, 155 id. 555.)

" Those rules, or the leading ones, may be summarized as follows, viz.: (1) Such a contract must be in writing and the writing produced, or, if ever based upon parol evidence alone, it must be given or corroborated in all essential particulars by disinterested witnesses — 180 N. Y. 121; (2) such testimony must be of the clearest and most convincing character —'180 N. Y. 121; (3) verbal admissions of the decedent in any event, and especially when uncorroborated by other facts or evidence, should always be weighed with very great caution, and such admissions, made in the course of casual conversation, when testified to after a great lapse of time, should be given little probative force — 180 N. Y. 120, 121; 194 id. 81; (4) the testimony of such a witness should be free from circumstances making it appear like an afterthought — 194 N. Y. 81; (5) the evidence must establish the alleged contract in certain and definite terms — 202 N. Y. 70; (6) the admissions should be recalled and expressed by the witness in substantially the exact language of the decedent and not merely according to the witness' understanding — 127 App. Div. 97; 194 N. Y. 81; and (7) the alleged contract, or what it would accomplish, should seem to be equitable — 177 N. Y. 48.

" These rigid rules are very clearly and emphatically asserted in the several recent cases from which the substance of the requirements have just above been excerpted."

*Third.* The claimant herself would be barred from testifying by section 347.

*Fourth.* The contract, so far as the proofs presented show, if there was any contract, was oral. To receive any serious recognition of the court it should be written. (*Varney* v. *Ditmars*, 217 N. Y. 233.)

*Fifth.* Notwithstanding all of the claims and the contentions of the petitioner and her witnesses as to the affection in which the petitioner was held and the place she filled in the household of decedents, the latter never legally adopted her. This fact is significant. They must have been advised as to their affairs by attorneys. They could readily have learned what the legal effects of an adoption would be where there was intestacy, yet there was never any adoption by them.

*Sixth.* In the suit brought by the petitioner against Leon since Mrs. Schinasi's death to recover a judgment for services rendered to him, an adjustment was arrived at which included certain payments to petitioner and the execution by her of the general release on May 7, 1930, which has been described above. This release includes not only Leon but his wife Ruby and *his heirs,* administrators and assigns.

This release is effective as a bar to any successful action which could be brought against an administrator c. t. a. of decedents' estates by petitioner to reduce her claim to judgment, for the real parties in interest in such a litigation would be the personal representatives of Leon and his wife and children and any other distributees of his estate and the distributees of the estates of decedent. The terms of the release were broad enough, in my opinion, to include all the persons who would ultimately be required to turn over half of decedents' estates were petitioner successful.

*Seventh.* The affidavit of Mr. Steuer, verified November 20, 1930, which contradicts certain statements in petitioner's affidavit and, among other statements, declares: " Without going into the details of the settlement of this litigation, I may state that nothing was ever said by Mrs. Stoeve that indicated that she ever had any claim of any kind against the late Solomon Schinasi or against the late Betti Schinasi, or that she ever intended to sue those estates. It was very specifically stated that the settlement was to be a settlement of anything and everything that either Mrs. Stoeve or her husband claimed, whether it was against the late Leon Schinasi or his wife, Ruby Schinasi, or the Schinasi Commercial Corporation."

(b) There is no allegation in the petition of the existence of unadministered assets.

(c) There are no unadministered assets in the estate of Solomon Schinasi.

(d) The unadministered assets in the estate of Betti Schinasi approximate only $5,000.

I hold, as a matter of law, that petitioner is not a creditor nor a party in interest in said estates, and that petitioner has failed absolutely to show, with any degree of probability, any prospect of

success in any litigation which she might bring after the appointment of an administrator c. t. a. of decedents' estates.

II. *Petitioner's laches in making a claim of the contract* alleged is fatal. It is presumed, of course, that she knew the contents of Solomon Schinasi's will, admitted to probate in 1919. Her brother Julius complained to Mrs. Schinasi in 1919, he swears, against the failure of testator to make provision for his sister as agreed upon. She knew that in his lifetime Solomon Schinasi and his wife did not legally adopt her and this would have been the expected, the natural act on their part were they under contract to treat her, hold her, and give half their estate to her as a daughter. She knew in 1919, we murt assume, that his will made no express provision for her unless it be argued that she might be included within the term " relations " used in the provision for the distribution of $100,000. She knew that the will did not even mention her name. Moreover she knew that by the terms of his *will the fund set up as a trust for his widow and Leon was on the death of the survivor of them to go to Leon's descendants and that if there should be no descendants then to certain charities.* She is, in other words, to be presumed to know the full force and effect of his will and thus, before the advertising for debts and debtors in his estate, she knew that the admission of that will to probate cut off any power either in the widow or in Leon to bequeath and devise her half of the estate of decedent. When the publication for debts appeared that was the time and the opportunity to file her claim. If in spite of the provisions of his will and for some reason she felt that the time had not arrived, or that the claim was as yet contingent, she should have filed it then and petitioned this court to reserve out of the estate sufficient funds to meet her claim, if and when determined. Such action would be required under section 207 of the Surrogate's Court Act, enacted in 1921, and under previous statutes the claim could have been presented and tried in 1919 or in 1920. (*Cornes* v. *Wilkin,* 79 N. Y. 129; *Francisco* v. *Fitch,* 25 Barb. 130; *International Harvester Co.* v. *Champlin,* 155 App. Div. 847, 848.) She failed to file any claim as required, and under section 2678 of the Code of Civil Procedure and its successor provision, section 208 of the Surrogate's Court Act, she is relegated to a suit against the distributees of said estate under the provisions of section 1837 of the Code of Civil Procedure, in force at Solomon Schinasi's death, or later, under section 170 of the Decedent Estate Law (as added by Laws of 1920, chap. 919). In due course the latter's estate was administered, all debts were paid, taxes general and State were paid and the estate was distributed, still no claim was filed on the alleged contract and no suit was brought against the dis-

tributees. Seven years after Solomon's death, Betti Schinasi died in 1926. No claim was filed or pressed against her executor, Leon, though notice to creditors was duly published. Debts were paid, taxes were paid and the estate entirely distributed with the exception of about $5,000. No claim was pressed nor suit prosecuted against Leon in his individual capacity except the action previously described in which a general release was executed by petitioner and her husband in favor of Leon and his wife Ruby and the Schinasi Commercial Corporation. Leon died in August, 1930. Lo! with all the principals to the alleged contract dead, with the executor and the residuary legatee of decedent's estate .dead, eleven years in fact after the death of Solomon and four years after the death of Betti Schinasi, with distribution of their estates made, and a complete change effected in the situation of the parties and the subject-matter, petitioner now takes steps to assert her claim. Her dilatoriness, her delay, her laches are undefensible and have not in the papers presented been justified. In *Matter of Becker* (28 Hun, 207) the court said: " The rights of suitors require that some reasonable limit of time should be fixed within which motions to vacate judgments should be made. *The law presumes that persons of full age are aware of the law of the land, and that their acquiescence in proceedings had in the courts, affecting their interest, is based upon their approval of what has been done.*

" In this instance the petitioner was advised, upon arriving at full age, of the proceedings had in the Surrogate's Court, admitting her father's will to probate. The circumstance that she brought an action, immediately upon arriving at full age, against the executors, and prosecuted the same to final judgment, is a conclusive circumstance that she was aware of what had been done in the Surrogate's Court, at least six years before she filed her petition to have the probate of the will revoked. *This long acquiescence on her part in those proceedings, not moving to secure relief from the effect which they had upon her interests, bars her of the right to have the same disturbed.*" (*Matter of Gori,* 129 Misc. 541; *Matter of Wagner,* 119 N. Y. 28; *Matter of Hoes,* 119 App. Div. 288; *Matter of Kent,* 173 id. 563, 567; *Matter of Kranz,* 41 Hun, 465.)

As matter of law and discretion the petitions are denied. Proceed accordingly.