In the Matter of the Estate of HERMANN SIELCKEN, Deceased.

Surrogate's Court, New York County, February 6, 1937.

Battle, Levy, Van Tine & Fowler [Kenneth M. Spence, George Gordon Battle, Robert M. Benjamin, Brainard Avery and Leo Brown of counsel], for the petitioner.

Selden Bacon and Leonard B. Smith [Nathan L. Miller and Selden Bacon of counsel], for the Irving Trust Company, respondent.

Chadbourne, Stanchfield & Levy [Leonard P. Moore and David S. Hecht of counsel], for the Estate of Thorleif S. B. Nielsen, respondent.

Garfield & Wrubel [Edward Garfield and Robert H. Wrubel of counsel], for John S. Sorenson, respondent.

FOLEY, S.   This is an application to vacate three decrees judicially settling the accounts of the executor.   The respondent, the Irving Trust Company, is the successor corporation of the original corporation named in the will, the Columbia Knickerbocker Trust Company of the City of New York and later known as the Columbia Trust Company.   The petitioner who seeks to vacate is Clara Sielcken-Schwarz, the widow of the decedent and the residuary legatee under his will.   The decrees sought to be vacated are dated July 7, 1921, July 11, 1922, and February 9, 1925.   They were made in separate successive accounting proceedings.

The length of this decision, and the departure from a habit of striving for terseness and brevity, may be excused by the multitudinous contentions of the parties which the surrogate is required to consider.

Hermann Sielcken, the decedent, was born in Germany and died in that country on October 8, 1917, while a state of war existed between it and the United States.   He came to the United States as a young man and became one of the leading wholesale coffee

merchants of the world. The firm under which he conducted his business was known as Crossman & Sielcken. Among other companies in which he was interested was the Woolson Spice Company. Part of the stock of that company was an asset of the estate at the time of his death and is one of the subjects of controversy here.

Mr. Sielcken went to Germany in the early part of 1914 and remained in that country for the balance of his life. He was a naturalized American citizen. The first account of the executor shows that his property at the time of his death was valued at approximately $7,000,000. His will, in view of the actualities existing at the time of his death, is relatively simple. It contained a small number of pecuniary legacies. The residue was given to his wife, the petitioner here. He appointed as his executors his brother and his two brothers-in-law whom he stated on the date of execution of the will in March, 1914, to be residing in Germany. He also appointed the Columbia Knickerbocker Trust Company as executor " for the purpose of collecting and converting into cash all my property situated in the United States of America," and he directed " said Company to transmit and pay over all the net proceeds thereof to my said Executors in Germany for administration and distribution by them. It is my wish that all my estate should be administered and distributed in Germany, under the laws and in the tribunals of Germany my domicile." He further stated that it was " my desire that the said Trust Company should engage as their attorney and legal counsel in the administration of the estate, Eugene Smith of the City of New York, who has been conversant with my personal affairs and those of my firm for the past thirty years." The trust company did retain Mr. Smith's law firm as its attorneys in the administration of the estate.

After the entry of the United States into the World war in April, 1917, and after the effective date of the Trading with the Enemy Act, a demand was made by the Alien Property Custodian for the possession of all his property. At the time of the demand the fact of his death was not definitely known in this country. The trust company was appointed by the Alien Property Custodian as the latter's agent in connection with the liquidation of the firm of Crossman & Sielcken of which the decedent was the principal owner. It continued to function as such agent until December 26, 1917, when, after the fact of death was known, the trust company was appointed temporary administrator of the estate. On January 26, 1918, the trust company was appointed executor of the estate. Mr. Sielcken appears in his lifetime to have been closely associated with the trust company.

On October 25, 1918, the Alien Property Custodian served a demand upon the trust company for the transfer of the interest of the petitioner here and of other persons interested in the estate of Hermann Sielcken. By permission of the Alien Property Custodian the trust company continued to act as the representative of the estate and the Custodian reserved his rights against such legatees as might be alien enemies. Under the Trading with the Enemy Act the jurisdiction of the Custodian extended not only to the property of alien enemies, but also to the property of American nationals who might be residing in Germany. The interposition of the Alien Property Custodian and his formal demands against the property of the petitioner created certain issues in the pending proceeding which are discussed later in this decision.

Other issues have been created because of the charge of the petitioner that Messrs. Davies, Auerbach & Cornell, a firm of attorneys who represented from time to time the trust company in its various corporate matters and in estates in this court, became the attorneys for Mrs. Sielcken-Schwarz, the petitioner, in the accounting proceedings. It appears also that they had acted in the liquidation of the firm of Crossman & Sielcken.

The pending application was originally brought on by a petition filed in this court on April 27, 1932. Thereafter, on November 29, 1933, an amended petition was filed which substantially changed the grounds of attack upon the decrees, made in the original petition. In general, the new reasons advanced constituted a charge of conspiracy initiated in the year 1919 between the corporate executor and members of the firm of attorneys — Davies, Auerbach & Cornell. The amended petition covers approximately seventy pages, but the purposes and design of the conspiracy may be summarized as follows:

(1) That the petitioner was induced by the president of the corporate executor to retain the firm of attorneys who represented her in the accounting proceedings and was thereby " misled, induced and enticed " into the approval of the accounts, transactions, receipts and releases of the executor in the administration of the estate.

(2) That there was a conflict of interest and duty on the part of the firm of attorneys in that they had represented the executor under continuing retainers for a period of years, had acted as its counsel in various matters and had represented other persons whose interests were adverse to the estate and hostile to the petitioner as its residuary legatee; that neither the executor nor counsel ever fully revealed to the petitioner the extent of the conflict in interest.

(3) That the petitioner was induced by the executor and its several counsel to rely and did rely upon them for her sole guidance and was deprived of independent legal counsel and advice.

(4) That the executor and its officers acted in other matters which conflicted with its capacity as a fiduciary of this estate.

(5) That the executor concealed from the surrogate the existence of the so-called " German will," a paper of alleged testamentary nature claimed to have been executed as a mutual will by the decedent and his wife, the petitioner.

(6) In general, it was alleged that by reason of this conspiracy and the gross negligence, fraud and deceit of the executor, the residuary legatee suffered loss in the sale of assets, in the handling of certain claims which existed either in favor of or against the estate, that attorneys' fees were improperly paid, executor's com- missions improperly allowed by the decrees and that the petitioner was required to spend a large sum of money for counsel fees and necessary expenses of litigation in the assertion or establishment of her rights in matters which were within the province of the duties of the executor and in which the rights of the estate should have been safeguarded by it.

The respondent-executor in its defense has vigorously denied these charges of conspiracy, fraud, negligence and imposition. It asserts that the petitioner knew over a long period of years the facts which she now asserts as the basis of fraud. It contends that its administration of the estate was conducted efficiently and honestly. It asserts that the petitioner in no way suffered financial loss by reason of any of its acts. It contends that none of the statutory grounds for the vacatur of a decree has been estab- lished by the petitioner and that the relief sought by her is barred by the Statute of Limitations, by laches, by acquiescence, by releases and by estoppel on her part.

The issues raised by the amended petition and answer were referred to a referee to take the testimony and report with his opinion. These issues presented two simple questions: Did the petitioner establish proof of the statutory grounds for the vacatur of a decree as required by the provisions of section 20, subdivision 6, of the Surrogate's Court Act? Is the petitioner barred by her laches?

The process of final determination of these questions by the learned referee and by the surrogate has been needlessly complicated by the extent of the testimony, which covers over 7,000 pages, by the pleadings which cover over 600 pages, by the very numerous exhibits received in evidence, by the large number of findings of fact and conclusions of law submitted to the referee and found

modified or rejected by him, and by the voluminous briefs submitted to the referee and to the surrogate.

Approximately thirty specifications of delinquency on the part of the executor were set forth in the amended petition. Many of these charges were abandoned or withdrawn by the petitioner during the reference. Of the original thirty charges of misconduct, the learned referee states in his report that at the close of the reference only nine remained before him for final determination, to which might be added his consideration of the so-called German will. He also states that this number was further reduced by the presumptive abandonment by the petitioner of four more of these issues.

The referee has recommended that the three decrees be reopened for limited attack by the petitioner upon the three accounts. As to the decree of 1921, he reports that the petitioner should be permitted to object to the account and be afforded an opportunity to present proof (1) as to the alleged failure of the executor to protect the estate in its sale of the stock of the Woolson Spice Company against claims asserted by minority stockholders, which resulted in a settlement of approximately $285,000 paid by the estate; (2) as to the similar failure of the executor to discover and prosecute the claim of the estate in the sum of about $900,000 against the Woolson Spice Company; (3) as to the payment of the sum of $7,500 to the executor for services rendered prior to the issuance of letters in its capacity as agent of the Alien Property Custodian of the United States.

As to the decrees of 1922 and 1925 he has recommended that the petitioner be authorized to contest the payment of attorney's fees to Morgan M. Mann which aggregated the sum of $5,000. He has also reported in favor of the reopening of all three decrees as to the award and payment of commissions to the executor and as to the counsel fees paid to the firm of Davies, Auerbach & Cornell. The referee has determined certain contentions of the petitioner adversely to her. Specific discussion of certain of them will be made in a subsequent part of this decision.

After a review of the entire record I am of the opinion that this application to vacate the decrees must be denied in its entirety because of the gross laches of the petitioner and because of her acquiescence in permitting these decrees to stand unchallenged for a long period of years. Entirely aside from this conclusion, the surrogate is also of the opinion that the charges of conspiracy, fraud and misconduct on the part of the executor, its officers and the attorneys have not been established and that no basis of surcharge exists or ever existed against the executor.

On the question of the laches of the petitioner, the documentary evidence, and particularly the letters written by the petitioner and to the petitioner, conclusively prove that she was fully informed years ago of the facts which have now been built up as grounds for the vacatur of the decrees. The learned referee has found as a fact that the petitioner was never informed of the true relationship of the respondent-executor and the firm of attorneys until the hearings in this proceeding. The correspondence with her as early as July, 1919, convincingly shows the opposite.

It is claimed that the conspiracy began in that month by the desire of Mr. King, the president of the executor-bank, to procure the retainer of Messrs. Davies, Auerbach & Cornell by Mrs. Sielcken so as to protect the executor from surcharge. Her principal attack upon the decrees involves not only this conspiracy, but the adversity of interest of that law firm between their representation of the executor in other matters and their representation of Mrs. Sielcken in the accounting proceedings. It should be noted that the firm did not represent the executor in the general administration of this estate. Mr. Sielcken's own attorney acted in that capacity with the undoubted confidence of the petitioner. It is the conclusion of the surrogate from the testimony that the recommendation to and the purpose of the retainer by Mrs. Sielcken were honest and that the firm was retained solely for the purpose of protecting the share of the estate belonging to Mrs. Sielcken and her individual property not included in the estate, from seizure by the Alien Property Custodian of the United States. The charge of any sinister motive or purpose is based on the mere suspicion of the petitioner, and is unsubstantiated. What was intended by Mr. King was prompt and effective action to prevent the possible loss to the widow of her very large interest in the estate. She was likewise most concerned in preventing that result. His cablegrams sent to her July 8 and July 11, 1919, emphasize that purpose. The contents of the cablegrams were transmitted to her through a bank in Norway, which was her financial agent. In a letter dated July 8, 1919, written by Mr. King to this agent, which was concededly received by Mrs. Sielcken, it was stated: " I took the liberty of suggesting in my cablegram that Mrs. Sielcken retain Mr. Edward Cornell because that gentleman was not only a friend of Mr. Sielcken, but is a lawyer of the very highest standing, a director of that company and its counsel in many of its important litigations." The company referred to as set forth in the preceding part of the letter was the corporate executor. This communication alone, without other evidence in the case, is sufficient to justify the conclusion that the petitioner knew in 1919 of the alleged conflict

of interest which she now asserts she learned for the first time, over thirteen years later.

There is evidence in the record also that she knew in 1919 and 1920 of other alleged inconsistent relationships of that firm of which she now complains. She arrived in this country in 1919. She had been given a copy of the first account and had been informed that if she decided to file objections to the account on matters not directly connected with the special purpose of the retainer of the law firm, that she should retain independent counsel.

It also appears that in the years 1919 and 1920 she consulted Mr. Bernard M. Baruch, a friend and adviser, concerning her situation in respect of the accounting proceeding and of the necessity of protecting her share of the estate from the demand for seizure by the Alien Property Custodian. It has been indisputably shown that the possible conflict of interest of her attorneys was discussed with him. The record is replete with documentary proof that she was informed between the years 1919 and 1923 of other matters connected with the administration of the estate and of which she now complains.

In 1920 she had been told by Mr. Baruch that she should retain other counsel and he even recommended to her a firm of attorneys. A period of over eighteen months elapsed between the time of her arrival in this country and the making of the first decree in 1921. Ample opportunity was afforded, therefore, to her to seek other counsel and to file objections to the account if she desired. She never retained new counsel until 1927. Her assertions that she was prevented from filing such objections by the imposition or insistence of the attorneys who represented her as against the Alien Property Custodian are unsupported by the evidence. It is unbelievable that a woman of her type would be dominated exclusively and lulled continuously into acquiescence for a period of eight years by any attorney or firm of attorneys. There is presented by the testimony a picture of a woman clever and independent in her judgment, with resolute and determined ideas, able to select and to be guided by skilled counsel, by business advisers and shrewd friends and undoubtedly trained by association with her husband in a keen knowledge of business transactions. She showed an enthusiastic sense of gratitude to her attorneys at the time of the successful completion of their efforts, but that gratitude subsequently turned to suspicion and distrust. She clearly had another trait of character which is demonstrated occasionally by certain litigants in this and other courts — the faculty of never accepting as final any settlement made with them. It is impossible to convince such persons of the injustice of their cause. The established

law applying to the case is never acceptable to them. They are motivated by an easily aroused sense of suspicion. No lawyer, regardless of his scrupulous and conscientious fidelity, can hope to escape groundless charges of disloyalty by such a former client. No general release, no compromise of a claim, no final judgment nor a decree has any permanent sanctity or conclusiveness to them, if a way may be found to question it. Fortunately the courts have found cogent and effective methods to prevent injustice to the persons unwarrantably attacked in these situations.

The petitioner in 1927 retained the services of a new attorney, a Mr. Brainard Avery, her present counsel. His industry and resourcefulness are sufficiently demonstrated in the record. Her own laches and that of her present attorney from 1927 to the date of the filing in 1932 of the original petition, which sought to vacate these decrees, are not explained. That petition was verified on March 24, 1932. Over twelve years, therefore, elapsed between the time of the disclosure of a possible conflict of interest of her former attorneys in 1919, and the time of the verification of that petition. Over ten years had elapsed since the making of the original decree. Over ten years had passed since her conference with Mr. Baruch. Almost ten years had elapsed since the date of the second decree and almost seven years from the date of the third decree. Five years had passed from the time of her retainer of Mr. Avery, her new attorney.

It is significant that her original petition in 1932 was confined to attacks upon the conduct of the executor in connection with the liquidation of the firm of Crossman & Sielcken and the subsequently formed firm of Sorenson & Nielson. No mention was made in that petition of any conspiracy by the trust company or its officers and the members of Davies, Auerbach & Cornell. The charges contained in the original petition have been decided adversely to the petitioner by the referee. His report in this aspect is accepted by the surrogate.

The amended petition in this application was filed November 29, 1933, thus a further delay of eighteen months occurred and that period must be added to the previously mentioned lapses of time. Fourteen years had elapsed since the disclosure of the alleged conflict of interest of its attorneys. The record contains no adequate explanation of the inconsistencies between the original petition of 1932 and the amended petition of 1933. There is no clear inference that any new evidence was discovered during the time which elapsed between the dates of verification of these two documents.

While applicable here only as a statement of the law, indication of the disposition of the petitioner to assert stale and belated

charges of conspiracy and fraud is found in the decision of the Court of Appeals in *Sielcken-Schwarz* v. *American Factors, Ltd.* (265 N. Y. 239). There the court found the petitioner had knowledge of the basic facts that there had been a conspiracy consummated by fraud and other wrong by her allegations in earlier complaints in other actions. The last action was dismissed because of the fact that it had been brought more than six years after the acquisition of such knowledge. and was thereby barred by the Statute of Limitations. In the pending proceeding no charge of a conspiracy or of a divided loyalty was made against the executor or the attorneys in the original petition in 1932. They were contained in the amended petition of 1933. At most, the attempted explanation of this delay and inconsistency is that additional details of the fraud and the extent of the fees derived from the executor by the attorneys, in matters other than in this estate, were discovered between 1932 and 1933. I have found that the petitioner knew of the alleged basic fact as early as 1919 and necessarily knew of it in 1932. Judge LEHMAN states: " A new cause of action for fraud does not accrue each time a plaintiff discovers new elements of fraud in a transaction or new evidence to prove such fraud. Where there is knowledge of facts sufficient ' to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises ' and may thus start the running of the statute. * * * Failure to discover all the details did not prevent the statute from running." (*Sielcken-Schwarz* v. *American Factors, Ltd.*, 265 N. Y. 239, at p. 245.)

These observations apply with equal force to the present proceeding and to the defense of laches in applications to vacate decrees under the equitable jurisdiction of the Surrogate's Court.

A decree may be set aside upon the ground of newly-discovered evidence. The tests applicable to the sufficiency and nature of such evidence are well established. (*Collins* v. *Central Trust Co. of Rochester*, 226 App. Div. 486; Jessup-Redfield Surrogates' Courts, p. 407.) A newly-discovered theory of liability contrived by an ingenious attorney is not newly-discovered evidence.

In *Geyer* v. *Snyder* (140 N. Y. 394) an attack under circumstances somewhat similar to those here was made upon the conduct of the executors. In that case there was a charge of conflict of interest against the executor in dealing with the estate assets and the purchase at an alleged inadequate price by the executors of an estate asset. The plaintiff waited to bring her action thirteen years after the execution of the release to the executors and sixteen years after the execution of the agreement of sale. The court held that the complaining party must act with diligence. Acquiescence for a

long period of years compelled an explanation. " From her long silence, there is a presumption of fair dealing which overrides any presumption of wrongdoing growing out of the trust relation of the parties." (*Geyer* v. *Snyder, supra,* at p. 402.)

Previously in *Matter of Hawley* (100 N. Y. 206, 210) the court had stated: " The due enjoyment of property rights, and the repose of titles, which that enjoyment requires, renders it necessary that the adjudications of legal tribunals, upon which rights to a large extent rest, should not be lightly disturbed or arbitrarily set aside and vacated after long lapse of time, for errors which should have been discovered and remedied at the time of their perpetration. Some excuse must be shown by a party why he has not availed himself of the right of review provided by the statute."

I accordingly hold that the laches and acquiescence of the petitioner constitute a bar to the reopening of the decrees. (*Matter of Hawley, supra; Matter of Griffin,* 210 App. Div. 564; *Matter of Niles,* 113 N. Y. 547; *Matter of Gude,* 150 Misc. 56; motion for reargument, 151 id. 59; affd., 242 App. Div. 609; *Matter of Illfelder,* 136 Misc. 430; affd., 232 App. Div. 740; *Matter of Schinasi,* 139 Misc. 459; affd., 233 App. Div. 738; *Matter of Becker,* 28 Hun, 207; *Matter of Wagner,* 119 N. Y. 28; *Matter of Hoes,* 119 App. Div. 288; *Matter of Kent,* 173 id. 563, 567.)

Entirely independent of this conclusion, the surrogate holds that no valid legal ground for vacating the decrees has been established by the evidence before the referee. The courts strive to maintain the sanctity of decrees of the Surrogate's Court made in accounting proceedings. This policy is strictly followed and except where the grounds set forth under section 20, subdivision 6, of the Surrogate's Court Act are proven, decrees will not be vacated. A decree may be opened or vacated only upon the ground of fraud, newly-discovered evidence, clerical error or other sufficient cause. The words " other sufficient cause " have been construed to mean under the maxim *noscitur a sociis* grounds previously mentioned in the section. (*Matter of Tilden,* 98 N. Y. 434.) Under the terms of the subdivision, the powers " must be exercised only in a like case and in the same manner as a court of record and of general jurisdiction exercises the same powers."

The limitations upon the granting of the relief sought in this application have been stated in numerous decisions. (*Matter of Tilden,* 98 N. Y. 434; *Matter of Hawley,* 100 id. 206; *Matter of Starbuck,* 221 App. Div. 702; affd., 248 N. Y. 555; *Matter of Brennan,* 251 id. 39; *Joseph* v. *Herzig,* 198 id. 456; *Matter of Hermann,* 178 App. Div. 182; affd., 222 N. Y. 564; *Matter of Morrison,* 160 Misc.

261; *Matter of Marsullo*, Id. 148; *Matter of Kern*, 159 id. 682; *Matter of Gilford*, 155 id. 339; affd., 247 App. Div. 782; *Matter of Illfelder*, 136 Misc. 430; affd., 232 App. Div. 740.) In a proper case where fraud, collusion or imposition has been established, the surrogate · may, under the statute, vacate the decree. (Surr. Ct. Act, § 20, subd. 6; *Matter of Silliman*, 79 App. Div. 98; affd., 175 N. Y. 513; *Matter of Robertson*, 51 App. Div. 117; affd., 165 N. Y. 675; *Matter of Henderson*, 157 id. 423; *Morgan* v. *Cowie*, 49 App. Div. 612; *Matter of Earle*, 74 id. 458; *Matter of Willets*, 119 id. 119; affd., 190 N. Y. 527; *Matter of Flynn*, 136 id. 287.)

Where fraud or dishonesty against a widow or infant or other beneficiary or a creditor is exposed, the Surrogates' Courts move promptly and vigorously to redress it. (*Matter of Wechsler*, 152 Misc. 564.)

The charge of a conspiracy, such as is asserted here, is futile, unless such conspiracy resulted in the entry of a decree by fraud. A review of the entire evidence taken before the referee, however, negatives any inference of a corrupt conspiracy to defraud, deceive or mislead the widow. The testimony does not admit of any other inference than that the president of the company and the attorneys acted solely for the protection of the petitioner's rights.

The learned referee has erroneously based his principal reason for reopening the decrees upon this conflict of interest. (*Eisemann* v. *Hazard*, 218 N. Y. 155; *Field* v. *Moore*, 189 App. Div. 709; *Haight* v. *Lloyd Royal Belge Societe Anonyme*, 217 id. 656.) He has apparently held that the existence of an adversity of interest by the attorneys alone constituted fraud and a ground for vacatur. In each of the last cited cases there was a technical conflict of interest. In each of them the client of the attorney or attorneys was informed of the circumstances. In each case the relationship was held insufficient as a matter of law to deprive the attorney of his right to compensation from the complaining client.

The mere fact that at one and the same time an attorney represents two different clients would not make it improper for him to act for both. " It is only where the nature of his work or advice is such that he would find himself in the equivocal, anomalous position of aiding one as against the other, or of being compelled to choose between them, that the dual service would be improper." (*Field* v. *Moore*, 189 App. Div. 709, at p. 712.)

Cases of apparent conflict constantly arise and yet present no actual disloyalty to the parties represented. Thus, one attorney may represent several partners in the formation, conduct or dissolution of a partnership and yet there is no impropriety in the

relationship. Again, in this court, the personal attorney of the widow may represent her as attorney both in her executorial capacity and as a beneficiary. An attorney for a creditor may represent him in his capacity as administrator. The mere conflict does not disqualify and experience shows in the great majority of such estates the administration is honestly conducted with due regard to the rights of all creditors and all beneficiaries. If the conflict disqualified the attorney in the administration of the estate or required the separate retainer by each creditor and beneficiary of an independent attorney, the cost of the administration of an estate would be increased to a burdensome extent. Where an actual issue is created between the rights of the representative in his or her individual capacity and the rights of other persons interested, the retainer of a separate attorney may be required.

If decrees settling an account, or releases executed by beneficiaries, were required to be set aside by the mere showing of the adversity of interest of the attorney, an intolerable situation would arise and needless litigation encouraged.

In each case the facts must be analyzed to ascertain whether there is a disqualifying adverse interest. Where an honest disclosure of possible divided loyalty is made, the parties are put on notice.

In the pending case it has been conclusively shown that disclosure of the fact of representation of the trust company by Davies, Auerbach & Cornell was made to the petitioner. It has also been shown that their retainer was for a specific purpose — the preservation of the rights of the petitioner to her property as against the demands of seizure of the Alien Property Custodian. That specialized work involved no conflict between the trust company as executor and the petitioner as beneficiary. The latter undoubtedly relied upon the honesty and efficiency of her husband's attorney, Mr. Smith, who had been retained by the executor to conduct the legal administrative phases of the estate. The attorneys were successful in protecting the rights of Mrs. Sielcken and obtained for her as against the demands of the Alien Property Custodian her share of the estate which amounted at that time to at least $4,000,000. They also represented her in preventing seizure of her individual property entirely outside of her interest in the estate. In association with this firm and without suggestion from the officers or attorneys of the trust company, Mrs. Sielcken also retained Mr. Smith, the son of the attorney for the executor in the administration of the estate. His retainer was likewise made for the special purpose of resisting seizure of her legacy by the Alien Property Custodian. The compensation received by all her

attorneys who acted for her in this matter was extremely reasonable when compared with the success of their efforts and the very large pecuniary advantage to her.

The observation of Justice MARTIN, now presiding justice of the Appellate Division, First Department, in *Haight* v. *Lloyd Royal Belge Societe Anonyme* (*supra*), where defendant resisted collection of the attorneys' fees, is appropriate to this situation. it is expressed in his usual vigorous style. " Technically there might seem to have been a conflict of interests. But if there was, it must have been known to defendant in the ordinary course of events and it was such as not to imply a sacrifice of the interests of the defendant. We are satisfied, furthermore, that the plaintiffs worked in the best interest of the defendant, bringing about a saving to it of about $5,000,000; and that defendant is now endeavoring on a mere technicality without substance or justice, to avoid payment under its arrangement with plaintiffs."

The surrogate specifically finds upon all the evidence that the technical conflict of interest of the petitioner's attorneys did not constitute fraud and is not a basis for the vacating of the decrees.

As to the fees charged and paid by the executor to Davies, Auerbach & Cornell, which the referee has found should be made the subject of objections by the petitioner in his recommendation that the decrees be vacated, I specifically hold that no ground for the elimination of these items as credits to the executor exists. If the present evidence had been before the surrogate in the original proceeding, the objections to these payments would have been overruled.

The charge that there was imposition or fraud by the executor upon the surrogate or the petitioner in not offering the so-called German will for probate is unsubstantiated and almost frivolous. She had knowledge of its existence. This so-called will made no change in the disposition of the estate over the provisions contained in the will actually admitted to probate. The executor in New York would have been entitled to function in exactly the same way it did under the admitted will because the so-called German will plainly appointed it executor by the tenor. Some change was made in the German executors, but the petitioner herself seems to have been most anxious to prevent the transmission of any of the funds or property of the estate to Germany despite the explicit directions of the testator to that effect in the admitted will. Plainly, she was motivated in this regard by a justified desire to escape the expense of a double administration and by the fear of imposition of death taxes or taxes on the right to receive the legacy imposed under German law. Where all the parties interested in an estate,

either under testacy or intestacy, agree that a will shall not be offered or admitted to probate, it is not within the power of a surrogate to enforce its admission. (*Matter of Billet*, 187 App. Div. 309.) Nor may a legatee who has benefited by the failure to probate it complain of the situation which she has created by her own acquiescence.

The sale of the stock of the Woolson Spice Company by the executor was at a fair and reasonable price and was properly made in the exercise of the current judgment of the officers of the executor. Not the slightest evidence of collusion or favoritism or any sinister interest in the sale has been shown. The evidence, and particularly the documents, establish that there was no legal basis for the claim of approximately $900,000 by the estate against the Woolson Spice Company. Nor was there negligence or fraud in the alleged omission of the executor to preserve the rights of the estate against the attack or ultimate settlement of the action induced by the minority stockholders of that corporation. Counsel for the petitioner has conceded that the actual selling price was the reasonable market price of the stock. The estate obtained from the sale the sum of $560,000. The amount of the settlement paid by the estate in the minority stockholders' action was approximately $285,000. If it were at all practicable in the arrangement of the sale for the executor to have obtained immunity from the claims of the minority stockholders, the selling price would naturally be affected by the existence of their claims and the net amount derived from the sale would not have been any more than the net amount actually received. Certainly no purchaser would have paid the full market value with the knowledge that he was buying a law suit with the stock. The tests of the conduct of a fiduciary are to be made in the light of existing circumstances and of current exercise of honest judgment and not by a wisdom developed by subsequent events occurring years later. (*Matter of Clark*, 257 N. Y. 132.) " A wisdom developed after an event and having it and its consequences as a source is a standard no man should be judged by." (*Costello* v. *Costello*, 209 N. Y. 252, 262.)

The referee correctly held that the judgment in the action brought by the Chase National Bank as ancillary executor of the estate of Nielson against the respondent-executor which was entered on motion of petitioner's own counsel, was an estoppel against her.

The referee further has held correctly that by reason of that judgment, the petitioner is estopped from challenging the payments to Sorenson & Nielson.

The referee has recommended that the decree be vacated to permit an attack upon the fee of $7,500 paid to the executor as compensation for its services as agent of the Alien Property Custodian in connection with the liquidation of the firm of Crossman & Sielcken. There was no foundation whatsoever for an attack upon this item. The services were rendered by the trust company for the protection of the interests of Hermann Sielcken, if living, or of his estate, if dead. At the time these services were rendered, the executor had not yet qualified as temporary administrator. There was no conflict of interest and the company acted for the protection of Sielcken and the protection of his property and with loyalty to the Federal government. The value of the service was fixed by the Alien Property Custodian under his statutory authority. That allowance was extremely reasonable for the amount of the property managed. It was properly paid by the executor and set forth in the account.

The misdescription in the original account of the time of rendition of these services was a purely clerical error which has been corrected by proof of the actual facts.

Nor may the decrees be reopened as to the payment of commissions to the executor. Upon the present state of the record, commissions would have been allowed by the surrogate in the exercise of his discretion because of the fact that no misconduct or other ground of denial has been established. A decree awarding commissions may not be reopened except for a conceded error of fact in the arithmetic involved in their computation, or a fraudulent misrepresentation as to the existence of assets or as to the fraudulent valuation of assets, or because of newly-discovered evidence substantially affecting the award of commissions in the decree. (*Matter of Brennan,* 251 N. Y. 39.) Under other circumstances, their general allowance or disallowance must be reviewed by appeal and the award of commissions may not be reviewed by the surrogate by a vacatur of the decree where questions of law are involved. (*Matter of Brennan,* 251 N. Y. 39; *Matter of Rosenthal,* 141 Misc. 404; *Matter of Barrett,* 124 id. 699.) In *Matter of Rosenthal (supra)* I pointed out that this salutary rule against the setting aside of a decree is necessary for the protection of the representative and the beneficiary and is applied impartially.

In *Matter of Barrett (supra)* a trust company sought a reopening and an award of increased commissions. The application was denied. In *Matter of Rosenthal (supra)* a beneficiary sought to reopen and her application was denied.

The learned referee was also in error in recommending the vacatur of the decrees as to the fees for legal services paid to Mr. Mann. The letter of the petitioner in evidence conclusively shows that

she had knowledge of his retainer and consented in writing to the payment of at least one of his fees to the extent of $1,500. It is apparent from the testimony that she had knowledge of the other fee paid to him. No fraud has been shown as to the payment of the latter fee, which was disclosed in the account. The decrees are conclusive as to the amount and propriety of the payments.

In conclusion it should be stated that no fraud on the part of the executor, or its officers or of Messrs. Davies, Auerbach & Cornell has been proven as a basis for vacating these decrees. No basis of surcharge against the executor has been established. The law demands proof and not mere speculation or surmise. Tangible facts must be proved, from which a legitimate inference of a fraudulent intent can be drawn. (*Jaeger* v. *Kelley*, 52 N. Y. 274, 276.) It is not enough to create a suspicion of wrong. The evidence in this pending proceeding plainly points to honest and fair dealing with the petitioner by the executor and the firm of attorneys. It is stated in *Shotwell* v. *Dixon* (163 N. Y. 43, 52): " When the evidence is capable of an interpretation which makes it equally as consistent with the innocence of a party as with his guilt, that meaning must be ascribed to it which accords with his innocence. It can only be so established by proof of such circumstances as are irreconcilable with any other theory than the guilt of the person accused."

The various releases executed by the petitioner, including that contained in the affidavit made by the petitioner respecting the sale of the stock of the Woolson Spice Company, I hold to be binding and effective. If she could read the instrument, " not to have read it was gross negligence; " if she could not read it, " not to procure it to be read was equally negligent; " in either case the writing binds her. (Quotations from *Matter of Stone*, 272 N. Y. 121, citing Wigmore on Evidence, § 2415; *Pimpinello* v. *Swift & Co.*, 253 N. Y. 159.) No imposition or fraud in their procurement has been shown.

The petitioner, during the course of the hearings before the referee, discontinued her claims for recovery against the executor of the estate of Nielson and against the respondent, Sorenson. The referee reserved for determination by the surrogate the question of the allowance of costs and counsel fees to these parties. Their application for counsel fees is denied. No statutory authority exists for the making of any such allowance. Costs may be taxed by them.

The referee has passed upon 530 findings of fact and 89 conclusions of law submitted by the respective parties. The reference was to take testimony and report with opinion. An opinion would have been sufficient without findings and conclusions. (*Matter of O'Connor*, 159 Misc. 522; *Matter of Carpenter*, 178 App. Div. 165; Surr. Ct. Act, §§ 66 and 71.)

In order to avoid the necessity for submission of further findings and conclusions consistent with this decision, or the modification of existing findings and conclusions of the referee, the surrogate in the exercise of his discretion adopts this decision as the final disposition of the proceeding. (Surr. Ct. Act, § 71.) Under the latter section, I hold that no findings and conclusions are required to be made. Surrogate WINGATE, in *Matter of O'Connor* (*supra*) has comprehensively reviewed the law applicable to the power and authority of a referee to dispense with findings and conclusions and the power of the surrogate to act upon the report of a referee or to make an independent and complete disposition of the issues involved in the testimony before the referee by the decision of the surrogate. He stressed the evidence of the intent of the revisers of the practice and procedure of the Surrogates' Courts and the further intent of the Legislature which enacted their recommendations in 1914, whereby the former burdensome requirements were eliminated.

The note of the revisers to section 71 of the Surrogate's Court Act (formerly section 2541 of the Code of Civil Procedure) reads as follows: " By the change we do away with the useless findings and the resulting miscarriage of justice often brought about by error in the findings or refusals to find. If each case goes up on a general verdict, the Appellate Division can do justice." (Sen. Doc. 1914, No. 23, p. 71.)

The Judicial Council of the State of New York in its reports has also stressed the desirability of an adequate and accurate decision as against the system of numerous and complicated findings and conclusions and has recommended the abolition in other courts of the latter requirements. Chief Judge CRANE of the Court of. Appeals, chairman of the council, in a public statement analyzed the advantages to attorneys, to litigants and to the courts, both of original and appellate jurisdiction, of the system of disposition by decision rather than by findings and conclusions. He said: " Surrogates' courts now have vast equity powers. Here again we have no such method as findings of fact and conclusions of law or requests to find. Either the decree of a surrogate is right or it is wrong according to the evidence in the case; and on appeal the record either sustains the conclusion or it does not. The appellate courts have before them the same evidence as did the surrogate." (N. Y. L. J. July 27, 1935, p. 275.) Certainly, the pending proceeding, with its many findings on multitudinous issues, is a convincing example of the benefits of the form of final determination authorized by the Surrogate's Court Act.

All of the findings and conclusions found, refused or modified by the referee are necessarily eliminated by the determination of the surrogate in this decision.

Tax costs. Submit decree on notice denying the application accordingly.