In the Matter of the Accounting of KEAN B. PANGMAN, as Executor of FRANK J. SIEGLER, Deceased, Respondent. ISTVAN TORMA, Consul General of Hungarian People's Republic in the United States of America, Acting on Behalf of ELIZABETH ZEISS and Others, Appellant; JACOB L. WILDOVE, Special Guardian for ELIZABETH ZEISS and Others, Respondent.

Third Department, July 8, 1954.

*Martin Popper, Paul L. Ross* and *Benjamin Spiegel* for appellant.

*Francis L. Smith* for executor, respondent.

*Jacob L. Wildove,* special guardian, respondent in person.

FOSTER, P. J. This appeal has been taken by the Consul General of the Hungarian People's Republic, accredited to the United States, from a final decree of the Surrogate's Court of Schoharie County. The Consul General represents certain nationals of Hungary who are legatees under the last will and testament of Frank John Siegler, who died a resident of Schoharie County on March 20, 1952. The Surrogate, after a hear-

ing, refused to direct the executor of decedent's estate to pay over to the Hungarian Consul, for transmission to the Hungarian legatees, moneys representing the legacies in question. Instead the Surrogate directed that such moneys be paid into the Surrogate's Court for the benefit of the legatees under section 269 of the Surrogate's Court Act. This section provides that such action may be taken where it appears that a legatee will not have the benefit, use or control of the money due him, or where other special circumstances made it appear desirable that payment be withheld.

The Surrogate said in his memorandum that he was not satisfied that the Hungarian nationals residing in Hungary would have the benefit, use and control of the moneys due them as contemplated by the statute cited. The Consul General argues that the decree of the Surrogate in the foregoing respect was in violation of the wishes of the legatees residing in Hungary, and also violated their constitutional rights. At the time of decedent's death there was in effect a " Treaty of Friendship, Commerce and Consular Rights " between the United States and Hungary. This treaty was originally executed on June 24, 1925 (44 U. S. Stat. 2441 — Treaty Proclaimed Oct. 4, 1926), and revived in 1947 pursuant to article X of the Treaty of Peace with Hungary. (61 U. S. Stat. 2065, 2115.) The record and briefs are silent as to whether the treaty was in effect at the time of the hearing before the Surrogate, but a footnote to *Matter of Braier* (305 N. Y. 148, 155) indicates that it expired July 5, 1952. The decree appealed from in this case was made December 2, 1953.

Appellant argues that the provisions of the former treaty were binding upon the Surrogate because the treaty was in effect at the time of decedent's death. It is true, under general principles too familiar to require the citation of authorities, that a treaty between this country and a foreign power becomes the supreme law of the land and any local statute must yield if there is a conflict between the two. We do not regard this appeal as presenting such an issue. The issue here is merely procedural and one of proof.

At the time the Surrogate made his decision the treaty invoked by appellant had expired, and whatever may be said as to its application to substantive rights it certainly was not binding as to merely procedural matters. The decree of the Surrogate has not deprived the Hungarian legatees of their property, and only as a matter of procedure it has been set aside for their

benefit and account until such a time as reasonable assurance be given that they will receive it (*Matter of Braier, supra*).

The narrow issue presented is one of proof. Concededly we presently have no national regulation forbidding the transmission of private funds to residents of Hungary. On the other hand no treaty existed at the time the Surrogate made his decision which bound his hands as to procedural matters. The question presented therefore is whether the Surrogate had before him sufficient proof to invoke the application of section 269 of the Surrogate's Court Act. He had before him two letters, one from the Department of State and one from the Department of Justice, both of which called his attention to a regulation of the Treasury Department which forbids the transmission of warrants or checks drawn on the United States to persons residing in Hungary because local conditions there preclude the assurance that the payee will receive such warrants or checks, or be able to negotiate them for full value. It was observed in the *Braier* case (p. 157) that " a check drawn on government funds would be no less likely to reach an Hungarian payee than would a draft on any private account."

As against this sort of proof there was a certificate from the Envoy Extraordinary and Minister Plenipotentiary of Hungary to the United States, stating in substance that the Hungarian legatees would have the full benefit, use and control of the moneys representing their legacies, subject only to the deduction of attorney's fees and a consular fee of 3%; that the National Bank of Hungary would pay directly to the legatees an equivalent in Hungarian currency at the official rate of exchange, and such payment would be made free of all taxes; and that there would be no other deductions or charges against the legacies. It also stated that the Consular Section of Hungary had, since 1947 to 1953, received for its nationals and transmitted to the persons entitled thereto moneys from twenty-three estates which aggregated at least the sum of $100,000. In this respect the evidence differs from most of the cases dealing with a similar subject matter, and particularly with the *Braier* case. In that case, which involved blocked funds, the Hungarian Consular authorities offered no proof to overcome the fair inference, to be drawn from the regulation of the Treasury Department as to public funds, that private funds would be no less likely to reach their owner. In this case, quite to the contrary, the weight of proof on that precise question is involved; and the controlling issue presented is whether the

Surrogate was obliged to accept the certificate of the Hungarian Envoy at its face.

In normal times we assume that a local court would probably accept the certificate of an Envoy to this country from a friendly power as to internal conditions in his country. But these are not normal times. Moreover, as we have pointed out, no treaty existed at the time the Surrogate made his decision which required him to accept the Envoy's certificate as conclusive. The fundamental purpose underlying the constitutional principle of treaty supremacy is to prevent a local court from interfering with the diplomatic arrangements of the United States. That purpose is not at issue here and hence it was not thwarted by the action of the Surrogate. Indeed it is quite apparent from the utterances of two governmental departments that the United States has no policy that would require a local court to give full faith and credit to the certificate of the Hungarian Envoy. We conclude therefore that the Surrogate was not bound by his certificate. In view of this conclusion we think the Surrogate had a right to rely on the regulation of the Treasury Department for the reason set forth in the *Braier* case (*supra*).

The decree, insofar as appealed from, should be affirmed, with costs to the respondent executor, payable from the estate.

BERGAN, COON, HALPERN and IMRIE, JJ., concur.

Decree, insofar as appealed from, affirmed, with costs to the respondent executor, payable from the estate.