S. Samuel Di Falco, S.
The decree judicially settling the accounts of the executors and trustees was dated January 6, 1959 and entered on January 8. In the present proceeding, Peter Bartók, individually and as attorney in fact for his mother, petitions for the vacatur of that decree on accounting and permission for both petitioners to file objections to the account. The will of the testator bequeathed to his elder son, Bela (who is not involved in the present proceeding), all of the testator’s property in Hungary, Germany and any other country controlled by Germany at the time of the decedent’s death. All of the remainder of his property, wherever located, was set up in trust during the life of his wife, Edith Pasztory Bartók. The income of the trust is to be paid to her for life. Upon her death, the remainder is bequeathed to his son, Peter, who was born of the marriage of the decedent and his widow. The elder son was born of an earlier marriage. The residuary trust expressly includes all of the decedent’s copyrights, all rights of renewal copyrights, and all rights in unpublished manuscripts.
In the accounting proceeding, Peter Bartók, as remainderman of the trust and as attorney in fact for his mother, executed an instrument waiving the issuance and service of citation, consenting to a decree settling the account, and releasing the executors and trustees from liability respecting the matters covered by the account. There were two executors and trustees, Victor Bator and Julius Baron, but the latter had been permitted to resign as executor and trustee by order dated March 15,1956. The accounts covered the transactions of both fiduciaries from the time of the issuance of letters testamentary, January 23, 1946, to March 31, 1956, and of Victor Bator as sole trustee, from that point up to December 31,1957. Bator appears to have been the active fiduciary, and all transactions involved in the pending proceeding were between Peter Bartók and Victor Bator. The widow and the other fiduciary are merely parties to the proceeding, and, therefore, although there are two petitioners and two respondents, it will be more convenient to refer to Peter Bartók as the petitioner and Victor Bator as the respondent.
*326 The grounds for the vacatur of the decree, as stated in the petition are: (A) “fraud and misrepresentations of Victor Bator, one of the accounting executors and trustees, by which he procured the execution by Peter Bartók, on September 10, 1958, both on his own behalf and as attorney-in-fact for his mother, of the General Release, Waiver of Citation and Consent filed herein”; (B) “fraud and misrepresentations perpetrated on this Court by said Victor Bator, one of the accounting executors and trustees, in the statements contained in, and in the information not disclosed by, the petition and the accounts filed herein”; (C) the “ defective and inadequate nature of the three accounts settled by the decree entered herein on January 6, 1959, such accounts being contrary in all respects to the rules and practice of this Court.”
At the hearing, the only witness produced was the petitioner. At the close of his direct examination, it was stated that cross-examination would take several days. The petitioners could not state definitively that they rested until they could determine whether the cross-examination would require the calling of other witnesses. The petitioners stated, however, that at that time and in the absence of cross-examination, they had no further witnesses to offer. The respondents moved to dismiss the petition for failure of proof. The court entertained that motion, reserving to the respondents the right of cross-examination if their motion was denied, and to petitioners the right to call such witnesses as might seem necessary in the light of the cross-examination. For the purposes of this motion, we therefore treat the case as one where the respondents waived the right of cross-examination and the petitioners rested upon the evidence in the present record.
The testimony of the petitioner does not disclose any fraud or misrepresentation in the procurement of the release and consent. The petitioner testified that in January, 1958, the respondent gave him an account, and requested him to examine and approve it. After a discussion in which the petitioner questioned expenses relating to the so-called Bartók Archives, the petitioner indorsed his approval thereon. He also executed an instrument of release. That account was not filed in court. Another account was thereafter prepared. The petitioner was furnished with a copy of the later account and also of the earlier account. He took both of them with him and examined them. The petitioner was able to understand, without explanation from anyone else, the precise difference between the earlier account and the later account. The respondent made no misrepresentation with respect to the account or the purpose of the release and the *327 consent. The petitioner returned with the papers and he executed the release, waiver and consent. The instrument signed by him was duly filed in the account proceeding.
The petitioner’s present claim of fraud and misrepresentation is not to a specific act or statement that is said to have induced him to act or to refrain from acting. The alleged fraud is said to be more subtle. Perhaps the petitioner’s claim is best outlined in the words of his counsel, as consisting ‘ ‘ of the following: (1) Bator’s dominant position; (2) Bator’s failure to acquaint Peter with the basic documents defining his rights and his mother’s; (3) Bator’s misrepresentations as to the nature of his powers, as trustee; (4) Bator’s misrepresentations as to the nature of Peter’s and his mother’s rights as beneficiaries; (5) Bator’s failure to disclose the material facts to Peter; (6) Bator’s misrepresentations as to his right to compensation for the special services supposedly performed by him as trustee; (7) the circumstances under which Bator presented the first release to Peter for signature (the second release merely confirming the first), and the collateral promises made by Bator to induce Peter to execute it.”
The first specification is not a kind of fraud at all, but is merely the petitioner’s argument that the two did not deal on equal terms but that the respondent was more experienced, more mature and in possession of more information. Nor can the second specification be characterized as fraud or misrepresentation. In 1958 the petitioner was 34 years of age. His father died on September 26, 1945, domiciled in New York. The petitioner’s mother returned to Hungary in 1946, and she has continued to reside there. Just prior to leaving here, she executed three instruments, a general power of attorney to her son, a special power of attorney to respondent, and an assignment to her son of all of her interest as income beneficiary of the residuary trust. The petitioner was then 22 years old. He claims that part of the fraud perpetrated in the accounting proceeding was the failure of the respondent to discuss the terms of the will with him, the failure of the respondent to discuss the terms of the power of attorney wherein his mother appointed him to represent her, and the failure of the respondent to show the petitioner a copy of the income assignment from the petitioner’s mother to the petitioner. The petitioner testified that he first saw a copy of the general power of attorney in January, 1959, although he .admits being in the room when his mother signed it, and he admits seeing £ £ about a corner of it ” at that time. The petitioner could not say that he was wholly unaware of the existence of a power of attorney, because in January, *328 1958 and again in September of that year, he executed instruments as attorney in fact for his mother. Nor does the petitioner say that he never saw a copy of the will. It would be incredible that between 1945 and 1958, the petitioner never saw a copy of his father’s will. What he complains of is that the respondent never did “ sit down with [him] and discuss the terms of [his] father’s will.” With respect to the assignment of income to himself, the petitioner was asked whether he had been told that an assignment of income was invalid, and he said: “Nobody told me it was invalid. Nobody even told me it existed.” Yet the petitioner had received money from the estate for his own use. It is inconceivable that he was totally unaware that he was an assignee of his mother’s interest in income. The failure of the respondent to read these instruments to a man of the age and business experience of the petitioner, cannot fairly be said to constitute fraud.
There is no evidence that the respondent misrepresented the nature of his powers as trustee or that he misrepresented the nature of the rights of either beneficiary. The petitioner testified to statements made by the respondent to him to the effect that “ it was up to him to disburse the income and to receive the income. It was up to him to make decisions as to which member of the family should get what, according to his own best judgment ”. The petitioner also testified to his request for an increase in the amount sent to his mother and to the reply of respondent “ that he did not think that was proper, and he thought that the Hungarian authorities were not letting her keep the money that he would send.” The petitioner also testified to a conversation wherein the respondent reported statements of the decedent with respect to what the widow should receive, although he admitted that the respondent stated that this provision was not in the will. The respondent made it clear that he was merely reporting the decedent’s personal feelings as expressed to him. The respondent may at times have spoken as if he had inherited the decedent’s authority to advise, guide and direct his family. There is no proof, however, that he had at any time misrepresented the terms of the will either in respect of his authority or their rights. Moreover, there is no proof that the petitioner at any time regarded any of these conversations as representing the terms of the will. The petitioner, on the witness stand, was neither so naive nor so witless as the present argument of his counsel would make him appear.
The rights of the beneficiaries and the obligations of the fiduciaries are not so clearly defined as the petitioner now con *329 tends. The difficulties arise, however, from the nature of the assets and the residence of the income beneficiary, rather than from the terms of the will itself. The sole asset of this estate at the time of the decedent’s death consisted of his musical compositions. All of the moneys collected by the fiduciaries consisted of royalties on the musical compositions and other payments for the use of the compositions. Under the terms of the will, the widow is entitled to all of the income of the trust fund. There has never been any judicial determination as to whether there should be an apportionment of the royalties and as to the portion, if any, that constitute principal and the portion that belongs to income. The widow is entitled only to such moneys as are allocable to income. Hence the refusal of the respondent to disburse all of the receipts cannot be said at this time to contravene the will. Moreover, the executors and trustees would not be justified in transmitting income to a resident of a foreign country, without some assurance that the beneficiary would have the benefit, use and control of the property sent to her. (Surrogate’s Ct. Act, § 269-a, formerly § 269.) Permission to transmit estate funds to Hungary has been refused. (Matter of Wells, 204 Misc. 975 ; Matter of Siegler, 284 App. Div. 436 ; Matter of Geiger, 7 N Y 2d 109.) The executors and trustees were undoubtedly aware of such complications and of the possibilities of personal liability, but they were apparently willing to help the decedent’s family, and may have regarded themselves as protected by the consent of the petitioner, both as assignee and attorney in fact of the income beneficiary and also in his own right as the remainderman. But wholly aside from the question whether the fiduciaries were protected or were open to liability, it is clear that, in the absence of a judicial construction of the will or judicial instructions, they were not obliged to send all of the receipts to the income beneficiary or to distribute them to the petitioner. It is true that the respondent did distribute estate assets to the petitioner with full knowledge that the petitioner was using a large part of them in his business enterprise. He did disburse assets without attempting to determine whether he must apportion the sums received between principal and income. The respondent may well have given the petitioner more than he was entitled to receive. He may well have transmitted to the widow more than he could establish as having been received by her or as having been subject to her enjoyment, use and control. The respondent may well have been mistaken as to what constituted principal and what constituted income which he could then distribute. There may thus be some lack of clarity and certainty on both sides with respect *330 to the beneficiaries’ rights as well as with respect to the trustee’s powers. In any event, on the record now before the court it does not appear that the respondent at any time misrepresented to the petitioner the terms of the will. The oral statements and the written statements now attributed to respondent as misrepresentations of his powers and their rights quite plainly could not have been understood by the petitioner as representations of the terms of the will.
The petitioner does not now contend that the accounts were incorrect or inaccurate or that he did not in fact receive all of the assets that were reported as having been distributed to the petitioner and his mother. The petitioner does not contend that too much was distributed in the way of assets, nor does he offer to return any of it. The petitioner’s objective in reality is to attack payments made by the respondent to himself, and the alleged misrepresentations respecting the beneficiaries’ rights and the trustee’s powers are merely added ammunition in the attack upon the accounting decree.
The sums or benefits received by the respondent from this estate may be divided into two classes: expenses relating to the so-called Archive and extra allowance to the respondent for so-called special services.
The respondent undertook to collect for himself letters and other memorabilia of Bela Bartók, which he characterized as “ The Bartók Archive ”. These papers and mementoes are entirely different from the manuscripts and musical papers which belong to the estate. There is only a single reference in the accounting proceeding to any 1 ‘ Archive ’ ’, and that is a disbursement in the year 1953. Whatever other disbursements there may have been for the benefit of the Archive must be mingled with and reported as general estate expenses without any indication that they refer to the so-called Archive.
The Bela Bartók Archive is concededly a private collection of letters and other memorabilia relating to the decedent. There is no contention in the present proceeding that it has any monetary value whatever. Concededly, the collection was undertaken by the respondent individually, and was not intended as an estate project or one for which estate funds could be used. In a letter dated November 24, 1954, respondent wrote to petitioner: “ But here I am—doing something that is a collection of mine but will ultimately help to enhance, to promote, to enrich the glory, the fame, and the public appreciation of the great man that was your father. The fact that I call that collection my own property does not make the collection to *331 serve but the Bartók name. On the contrary, I have-nó' doubt that in my possession that benefit, that radiation of the archivé, will be more assured than if it were owned by someone else. Therefore, I would like you to answer squarely the question I posed to you in my previous letter. I would like to know whether you approve of and are willing to help my plan to collect and build up an archive of Bartók mementoes.”
The petitioner thus knew of the respondent’s collection of letters and memorabilia. He does not claim that the property collected by the respondent should belong to the estate. Indeed, from a purely financial standpoint, it may be a liability rather than an asset. What he does contend is that being a private asset of the respondent, it was not a proper object of estate expense; that the respondent did use estate funds to finance the collecting of such memorabilia, and that the respondent falsely and fraudulently advised the petitioner that he was entitled to finance the expenses of his private collection out of trust income, subject to the trust being reimbursed at his convenience.
The respondent does not contend that the estate should pay the expenses of the collection. It appears that, on behalf of the estate, the respondent was engaged in collecting, sorting, cataloguing and preserving manuscripts and musical papers. The petitioner testified to a conversation with the respondent in which the latter told him that it was very difficult to determine how much of the expenses were for the Bela Bartók Archive, because they were paid to people who were working also for the estate and who might work at one moment for the estate, the next for the Archive and then do something that was for the benefit of both. The petitioner had been aware of some difficulty in apportioning the expenses even before the first account was presented to him. He testified that at the time he examined the first account in Januafy, 1958, he told respondent “that I didn’t think that I could straightforward sign it or approve it, because I was aware—I knew that in the accounting there were figures which were spent — which showed amounts spent on the Bela Bartók Archive which I knew to be Mr. Bator’s personal venture, and I didn’t think that it was right that I should then approve the income of the estate should have been spent on this personal venture. And Mr. Bator agreed that it was correct and that the reimbursement of these various incomes was going to be done as soon as the amounts would be established, which he promised to do immediately.” A letter written by the respondent prior to the January account advised the petitioner that the respondent had paid personally *332 for certain expenses properly chargeable to the estate and the estate had paid some expenses properly chargeable to the Archive. That letter said also: “ I have the feeling that these two amounts will more or less balance each other—that is, the payments made by the Estate which were not strictly spent on Estate property, and my payments spent on Estate property. However, an analysis of the expenses will be made to discover the details. Now that the Estate has sufficient funds and the work on the manuscripts is about to be completed, the time had come to examine all these facts and figures and to separate the two groups. Should any balance exist in favor of the Estate, I shall pay it into the Estate’s account. On the other hand, should any balance result in my favor, I shall ask you, Peter to repay to me that balance. I do not think that the amount could be substantial either way.”
It is clear, therefore, that there was no fraud or misrepresentation on the paid: of the respondent with respect to the Archive collection. The petitioner was under no misapprehension with respect to the facts. The facts that he now claims to exist were told to him prior to the accounting. It is true that neither of the two accounts made a change in these items of expense, and that, insofar as the present record shows, no segragation or clarification of the figures had been made in respect of estate expenses or personal expenses. While the account lists a number of expense items chargeable against the estate, it is patent that the parties have left open for future adjustment, the question whether some of these items should be paid by the respondent personally. Neither the petitioner nor his mother is in any way concluded by the decree on accounting from demanding payment to the estate of any sums taken by the respondent for the expense of his private collection. The account that was filed and judicially settled contained no statement of disbursements made for the respondent’s own personal projects. In view of the fact that the account did not give notice of amounts spent by the estate for the respondent’s personal interests and in view of the understanding between the respondent and the petitioner, the decree on accounting does not foreclose the petitioner from raising the issue in a future accounting proceeding and compelling reimbursement of the estate by the respondent, if any money be owed by him to the estate.
With respect to the additional allowance for special services rendered by the respondent, the petitioner’s own testimony establishes his consent to the compensation paid to the respondent. In fact, the petitioner concedes that he himself signed *333 checks for a substantial amount of the additional compensation. He testified that the respondent proposed additional compensation, “ he would like it to be 10 per cent, and whether I would agree; and I considered it reasonable, I told him, but that the account shows a higher amount than 10 per cent of the first 12 years gross intake, and that also was going to be reimbursed or settled in some way in the future with the estate. ’ ’
Again, the petitioner testified that the respondent “ said that he found out that the trustee or he, in his position, was entitled to a certain very small commission by law, which is very small, maybe in the vicinity of one or two per cent of the income * * * and would I agree to the commission being 10 per cent, and I said that I would agree to that.” There can, therefore, be no doubt that the petitioner freely and voluntarily consented to the amounts that were actually paid to the respondent as additional allowances for special services.
In the accounting proceeding, the respondent sot forth at some length in his petition the agreement for payment of additional services. He alleged that at the time of the decedent’s death, his musical compositions were not widely known and were seldom performed in this country. The total income received by the executors for the first two years of administration were, respectively, $2,891.04 and $3,693.50. The royalty income was progressively increased. For the year 1957 it amounted to $59,111.19. The respondent said that this accomplishment was the result of a vast amount of promotional and public relations activities. He alleges that the fees which he took for the allegedly “highly specialized supplementary services” were based upon an arrangement which he made with the petitioner herein, and he alleged also that these sums include a considerable expense incurred for the operation of a separate office which was being maintained for estate business.
There is no contention that the petitioner received sums other than those reported in the account as payment of commissions or compensation. The account reveals a payment of an advance against the trustee’s commissions of $1,681.32. It also reports the sums which the petitioner alleges were taken for extra compensation. The petitioner’s own testimony makes it clear, however, that he had agreed to additional compensation at the rate of 10% of the receipts, that he knew precisely how much had been taken by the petitioner for the additional -commissions, and that ho knew that the respondent had taken a sum that was greater than the agreed proportion of the then collected income. The petitioner had agreed with the respondent that the excess commission was to apply to future services.
*334 The court holds that there was no fraud or misrepresentation with respect to the additional compensation paid to the-respondent. The petitioner freely and voluntarily consented to the payment of additional compensation with full knowledge that it exceeded the commissions provided by law. With respect to compensation over and above that earned up to the closing date of the account, the decree on accounting made no determination as to the period or the body of services covered by the excess amount received by the respondent. This court has heretofore pointed out (N. Y. L. J., Nov. 22, 1960, p. 14, col. 5) that the decree on accounting does not estop the petitioner from inquiring into matters not disclosed by the account which had been filed. A “ decree on accounting * * * is limited in operation to matters embraced therein and it does not bind the parties as to matters not disclosed in the accounting proceeding. * * * The rule is that where the items set forth in the prior account were not calcunlated to give the beneficiaries notice of the true state of facts, the beneficiaries are not estopped by the prior decree.” (Matter of Froehlich, 82 N. Y. S. 2d 884, 887, affd. 275 App. Div. 707 ; Matter of Ryan, 291 N. Y. 376, 416.) Hence it is not necessary for the petitioner to seek the vacatur of the decree in order to raise an issue in respect of payments made by the respondent to his personal use and not so reported in the account or as to services required to be rendered by him after the period covered by the account.
The petitioner critizes the form of the prior accounting and its alleged failure to conform to accounting practices. Even if such an objection had merit, it was waived by failure to advance it during the proceeding. It affords no basis for vacating the decree.
The petitioner has failed to establish any ground for vacating ¿he decree on accounting. ‘ ‘ The courts strive to maintain the sanctity of decrees of the Surrogate’s Court made in accounting proeedings. This policy is strictly followed and except where the grounds set forth under section 20, subdivision 6, of the Surrogate’s Court Act are proven, decrees will not be vacated. A decree may be opened or vacated only upon the ground of fraud, newly-discovered evidence, clerical error or other sufficient cause. The words ‘ other sufficient cause ’ have been construed to mean under the maxim noscitur a sociis grounds previously mentioned in the section.” (Matter of Sielcken, 162 Misc. 54, 65 ; Matter of Brennan, 251 N. Y. 39, 41 ; Matter of McGill, 276 App. Div. 281, 283 ; Matter of Ernest, 257 App. Div. 617 ; Matter of Nelson, 274 App. Div. 967.) The petitioner’s own testimony shows that there was no fraud or *335 misrepresentation relating to the prior account, but that, on the contrary, the petitioner was fully aware of all material facts and circumstances. The application to vacate the decree on accounting is denied.