FIRST NATIONAL BANK OF CINCINNATI, ADMR., *v.* MOSHKOVNA (MOISEEVNA) FISHMAN, ET AL.

(No. 2299—Decided January 5, 1966.)

Hamilton County Probate Court.

*Messrs. Marks & Weiner,* for The First National Bank of Cincinnati, Administrator of the Estate of David Port, deceased.

*Messrs. Goodman & Goodman,* representing the next of kin of David Port, deceased.

*Mr. Charles G. Heyd,* Assistant District Attorney for the Southern District of Ohio, representing the United States of America.

DAVIES, J. The First National Bank of Cincinnati, Ohio, as administrator of the estate of David Port, also known as David Portnoy, deceased, in its petition for determination of heirship has asked the court "to determine who the heirs and distributees of said decedent, entitled by law in this state to inherit, are according to the statutes in such case made and provided, and for such other orders and relief in the premises that the court deems proper." The petition lists eleven defendants, all of whom reside in Russia, who, the plaintiff alleges, claim to

be the heirs, next of kin and distributees of said decedent, and claim to be entitled to share in the distribution of said estate.

The evidence discloses, and the court finds, that the said David Port, also known as David Portnoy and David Portnoi, who was born in the southern part of Russia, near Kiev, on September 3, 1889, when he was twenty-one years of age came to the United States, eventually settled in Cincinnati, became a naturalized citizen of the United States, was inducted into the armed services of the United States in December 1917, was discharged from the army on or about June 16, 1919, and on March 10, 1921, when he was thirty-two years of age, after a hearing in the Probate Court of Hamilton County, was found to be "insane" and committed to the Longview State Hospital where he remained until his death.

On June 13, 1921, Samuel I. Lipp was appointed guardian of the person and estate of the said David Port, "a lunatic." Upon the death of Samuel I. Lipp in 1930, Abraham Lipp became successor guardian of the person and estate of the said David Port, and in 1935, Abraham Lipp resigned as said guardian and the First National Bank of Cincinnati, was appointed guardian of the estate of David Port and served in that capacity until April 28, 1958, when David Port died intestate.

When the guardian was first appointed in 1921, the ward's estate consisted of $817.57 in personalty. After the appointment of the guardian, the income of the ward consisted wholly of compensation received from the United States Veterans Bureau.

The ward remained in Longview State Hospital from the date of his commitment on March 10, 1921, until the date of his death on April 28, 1958, and expenditures of the various guardians consisted of payments, approved by the Veterans Bureau, for the maintenance of the ward at Longview State Hospital, court costs, guardian and attorney fees, and incidental expenses of the ward. In addition to these payments, upon representation made to the court by the various guardians that David Port had supported his aged and infirm mother, Basia Avrum-Leibovna Portnayna, and two minor brothers and two minor sisters who resided in Yanushpol Township, State of Volyn, Russia, who were solely dependent on the said David Port, and that in order to properly support, clothe and feed

said mother and minor brothers and sisters, it would be for the best interest of the ward and all parties that the guardians be allowed to make certain monthly payments to said mother for herself and her minor children, the brothers and sisters of David Port, the court authorized such payments, and these payments, all of which were approved by the Veterans Bureau, totalling a substantial sum of money and varying between $25.00 and $100.00 per month, were expended prior to the cold war with Russia for the care and support of the ward's mother and his minor brothers and sisters.

On May 6, 1958, the First National Bank of Cincinnati, was appointed administrator of the estate of the said David Port, deceased.

According to the last (seventh) current account filed by the administrator, the bank has on hand twenty United States Treasury Bonds with a total face value of $34,500, and cash in the amount of $1085.24 in said estate for distribution to the heirs of the decedent, David Port.

The First National Bank, as administrator of the estate of David Port, deceased, has taken a non-committal position in regard to the determination of the court as to who the heirs, next of kin and distributees of decedent's estate are by "leaving that issue to the court upon the evidence presented," although "not admitting that any" of the defendants named in its petition "are the heirs of David Port, or that they are alive today." The bank, however, does contend that none of the assets of the decedent's estate should be transferred at the present time to any of the defendants whom the court might find to be next of kin of the decedent because of the provisions of Section 2113.81, Revised Code, detailing its reasons for such contention as follows: "(1) The present government of the Soviet Union is a dictatorship diametrically opposed, antagnostic, and in extreme conflict with the American principles of liberty, justice, equality and our democratic form of government, and in addition, is despotic, ruthless, atheistic, immoral and completely dedicated to the destruction of our American way of life. (2) In present day Russia all foreign remittances must be passed on to the State Bank, an instrumentality of the Communist Government. Failure to do so is punishable as a felony. (3) Under the cur-

rency exchange rates presently existing in Russia, any heirs residing in Russia, would get, at the very most, only a minimal fraction of the value of the residue of this estate. (4) The United States Government has determined through a Treasury Department ruling that local conditions in Russia are such that there is not a reasonable assurance that a payee in Russia will receive checks or warrants drawn against funds of the United States, or agencies or instrumentalities thereof, and be able to negotiate the same for full value. (5) Soviet legislation permits only inheritance of personal property based on earned labor income. If the Soviet heirs were to receive the assets of this estate, they would be obtaining 'unearned income,' which is prohibited to a Soviet citizen and which 'unearned income' is subject to confiscation by the State. (6) If this court permits the transmission of the residue of this estate to Russia, the Communist Government of that country will acquire the bulk of the residue by means of unfair currency exchange regulations, outright confiscation or otherwise, and the probabilities are that all or part of this money will be used to finance such further activities as the Berlin Wall, Korea Conflict and Viet Nam.''

The United States of America was represented at the trial by the Assistant District Attorney for the Southern District of Ohio and took the position that if David Port died, intestate, without any next of kin surviving him, it was entitled to the assets in the decedent's estate because all of the assets had been accumulated from payments made to David Port by the Veterans Administration, an agency of the United States. The government did not take a position on the plaintiff's contention that the assets of the estate should not presently be distributed to any of the defendants because there is no federal law which prohibits the distribution of assets to a legatee or distributee not residing in the United States from the estate of a decedent who was domiciled in the United States at the time of his death and the question of distribution of the assets in a decedent's estate is determined solely by the laws of the state in which the decedent was domiciled at the time of his death.

Counsel for the defendants contends that the defendants are the next of kin of David Port, deceased, that the evidence

does not show that the defendants, if found to be the next of kin, will not have the benefit or use or control of the money or other property due them from David Port's estate.

On March 18, 1963, the attorney "for the heirs in the estate" of David Port, deceased, applied to the court for the appointment of Adelaida Lvovna Yakovleva as a commissioner for the taking of a deposition of Rakhil Isakovna Feldman and Yankel Pinkhosovich Kurtzman who, he said, resided in Moscow, U. S. S. R. With the approval of the First National Bank as administrator of the estate of David Port, deceased, and of the Assistant District Attorney for the Southern District of Ohio, representing the Veterans Administration and the United States of America, the court authorized the taking of said deposition, and the witnesses, in response to interrogatories contained in a document designated "Cross-Letters Rogatory," which has been filed in court, stated that when they were young they lived with their families in Yanushpol (Yanov), Russia, where the Portnoy (Portnoi) family lived, that they knew David Portnoy (David Port), his mother and father, brothers and sisters, nieces and nephews. The witnesses gave extensive information concerning the Portnoy family, including information relating to the living members of the family and their present addresses in Russia.

Reputable individuals who reside in Greater Cincinnati testified that they were born and raised in the same vicinity in Russia as David Port and his family and that they emigrated, as did David Port, to the United States and associated with him in Cincinnati and visited him at Longview State Hospital during his commitment there.

Certified copies of numerous birth certificates, marriage licenses, and death certificates of members of the Portnoy family in Russia were presented to the court.

The evidence clearly discloses, and the court finds that the mother and father of David Port predeceased him, that David Port was unmarried, had no children or their lineal descendants, adopted children or designated heirs. The court further finds that David Port was survived by certain brothers and sisters and lineal descendants of a predeceased brother and sister, all of whom live in Russia. Under these circumstances Section

2105.06(F), Revised Code, provides that the estate of the decedent shall descend "to the brothers and sisters, whether of the whole or of the half blood of the intestate, or their lineal descendants, per stirpes."

The court finds from the pleadings and testimony that on April 28, 1958, the date of David Port's death, the following eleven persons, with their ages, relationship to the decedent, addresses, and portion inherited were entitled to share in the distribution of the estate of David Port, deceased:

(1) Shura Yakovlevna Portnaya (daughter of Yacob, or Yankel, Portnoy, or Portnaya, the predeceased brother of David Port), adult, niece, No. 55 Libknecht Street, City of Zhitomir, Russia     1/7

(2) Elka Moshkovna (Moiseevna) Fishman, adult, sister, No. 19 Malo-Vilskaya Street, City of Zhitomir, Russia     1/7

(3) Anatoly Efimovich Druz, also known as Chaimovich (son of Reizl, also known as Reizia Portnoy Druz, predeceased sister of David Port), adult, nephew, No. 37 Warsaw Road, Apartment 1, Moscow, Russia     1/28

(4) Ziama, also known as Zalman Chaimovich Druz (son of Reizl, also known as Reizia Portnoy Druz, predeceased sister of David Port), adult, nephew, No. 17a Malaya Botanicheskaya Street, Apartment 38, Moscow, Russia     1/28

(5) Maria Efimovna Druz (daughter of Reizl, also known as Reizia Portnoy Druz, predeceased sister of David Port), adult, niece, No. 17a Malaya Botanicheskaya Street, Apartment 38, Moscow, Russia     1/28

(6) Mikhail Ilyich Druz (son of Ilya Druz, the son of Reizl, also known as Reizia Portnoy Druz, sister of David Port, both Ilya and Reizl having predeceased David Port), adult, grand-nephew, No. 7 First Khoroshevskaya Street, Apartment 43, Moscow, Russia     1/56

(7) Efim Ilyich Druz (son of Ilya Druz, the son of Reizl, also known as Reizia Portnoy Druz, sister of David Port, both Ilya and Reizl having predeceased David Port), adult, grand-nephew, City of Sverdlovsk, Russia     1/56

(8) Leib Moshkovich Portnoy, also known as Lev

Moiseevich Portnoy, adult, brother, No. 115 Sovietskaya Street, Town of Slobodskoy, Kirovskaya Province, Russia 1/7

(9) Mordko Moshkovich Portnoy, adult, brother, Apartment 51, No. 3 Noginskaya Street, Town of Elektrostal, Moscow Province, Russia 1/7

(10) Zema Moshkovich Portnoy, adult, brother, The Pervomaiskaya SOS, Krasnodarsky Kraj, Russia 1/7

(11) Feiga Moskovna Gil, also known as Faina Mikhailovna, adult, sister, Apartment 51, No. 3 Noginskaya Street, Town of Elektrosal, Moscow Province, Russia 1/7.

The defendants have executed powers of attorney designating a law firm in New York City to collect ''damages, awards, insurance and benefits arising by reason of the death of'' David Port.

The only restrictions placed upon the distribution of money or property from an Ohio decedent's estate to legatees or distributees not residing within the United States or its territories are found in Section 2113.81, Revised Code, which reads as follows:

''Where it appears that a legatee or a distributee, or a beneficiary of a trust not residing within the United States or its territories will not have the benefit or use or control of the money or other property due him from an estate, because of circumstances prevailing at the place of residence of such legatee, distributee, or a beneficiary of a trust, the probate court may direct that such money be paid into the county treasury to be held in trust or the probate court may direct that such money or other property be delivered to a trustee which trustee shall have the same powers and duties provided in Section 2119.03 of the Revised Code for such legatee, distributee, beneficiary of a trust or such persons who may thereafter be entitled thereto. Such money or other property held in trust by such county treasurer or trustee shall be paid out by order of the probate judge in accordance with Section 2113.82 of the Revised Code.''

Section 2119.03, Revised Code, outlines the powers of the trustee. Section 2113.82, Revised Code, provides that ''When a person entitled to money or other property invested or turned into the county treasurer or to a trustee under Section 2113.81

of the Revised Code satisfies the probate court of his right to receive it, the court shall order the county treasurer or the trustee to pay it over to such person.''

The Federal Government places no restrictions upon the distribution of funds from estates within the United States to beneficiaries or heirs who reside in the Union of Soviet Socialist Republics or elsewhere because the government believes the administration of estates is a matter within the jurisdiction of the various states, and that the state courts having funds to be distributed to beneficiaries abroad are the appropriate bodies to determine whether, in accordance with state law, distribution should be made and, if so, what procedure should be adopted to insure receipt of the estate shares by the persons for whom they were intended.

The Secretary of the Treasury, however, is authorized by federal law (31 U. S. C. 123) to determine the countries to which United States Treasury checks may not be sent because local conditions preclude assurance that the payee will receive the check and, if he receives it, will be able to negotiate it for its full value. The Secretary of the Treasury on June 10, 1957 (22 Fed. Reg. 4134, Title 31, Part 211.3) issued the following regulation, which still is in effect:

''(a) The Secretary of the Treasury hereby determines that postal, transportation, or banking facilities in general or local conditions in Albania, Bulgaria, Communist-controlled China, Czechoslovakia, Estonia, Hungary, Latvia, Lithuania, Rumania, the Union of Soviet Socialist Republics, the Russian Zone of Occupation of Germany, and the Russian Sector of Occupation of Berlin, Germany, are such that there is not a reasonable assurance that a payee in those areas will actually receive checks or warrants drawn against funds of the United States, or agencies or instrumentalities thereof, and be able to negotiate the same for full value.

''(d) Power of attorney for the receipt or collection of checks or warrants of the proceeds of checks or warrants included within the determination of the Secretary of the Treasury set forth in paragraph (a) of this section will not be recognized.''

Courts in other jurisdictions have been asked to decide in many cases under laws, substantially the same as Section

2113.81, Revised Code, which are known as *iron curtain statutes* if a legatee or distributee residing in an *iron curtain* or *communistic* country will have the benefit or use or control of money or other property due from an estate being administered in a state of the United States. The courts almost always have held that such distributees will not have the benefit or use or control of such money or property and the decisions usually have been based upon direct testimony, upon the aforementioned regulation of the Secretary of the Treasury determining that there is not a reasonable assurance that payees residing in the *iron curtain* countries mentioned in the regulation will actually receive checks or warrants drawn against funds of the United States, or agencies or instrumentalities thereof, and be able to negotiate the same for full value, and upon judicial knowledge taken by the courts of known conditions existing within iron curtain countries where the legatees or distributees reside and of the hostility of Russia and other iron curtain countries toward the United States of America.

Of the propositions involved in the pleadings, or relevant thereto, proof by evidence may be dispensed with where the court is justified by general considerations in declaring the truth of the proposition without requiring evidence from the party, which is the process most commonly meant by the term *Judicial Notice*. Wigmore on Evidence, Third Edition, Book IX (Section 2565, p. 531). That a matter is judicially noticed means merely that it is taken as true without the offering of evidence by the party who should ordinarily have done so. This is because the court assumes that the matter is so notorious that it will not be disputed. (Section 2567, p. 535.) Pending decision as to judicially noticing a matter and stating the terms as noticed, the judge may seek sources of information to assist him. Hence, the judge is entitled to aid himself in reaching a decision by consulting any sources of information that serve the purpose, —official records, encyclopedias, any books or articles, or indeed any source whatever that suffices to satisfy his mind in making a ruling. (Section 2568(a), p. 537.) The doctrine of Judicial Notice is discussed at length in 31 Corpus Juris 2d, beginning at page 824. Some of the conclusions reached, supported by court decisions, are as follows: Courts may properly take judicial notice of facts that may be regarded as forming part of the

common knowledge of every person of ordinary understanding and intelligence. (Section 9, p. 824.) Since judicial cognizance may extend to matters beyond the actual knowledge of the judge, he may, in ascertaining facts to be judicially noticed, resort to, or obtain information from, any source of knowledge which he feels would be helpful to him, always seeking that which is most appropriate. (Section 12, p. 833.) Courts may take judicial notice of historical facts and matters of public history, including the political history of foreign countries, including notice of matters of current or recent history, and of authoritative historical documents and materials. 31A Corpus Juris 2d (Section 58, p. 32). The courts will take judicial notice that the objective of the Communistic Party is to overthrow the government of the United States, and other governments, by force and violence if necessary, and substitute therefor the communistic form of government, and that the Communistic Party and communistic front organizations are vehicles of a major world power and take orders from it. (Section 61, p. 35.) Judicial notice may be taken of important or generally known historical facts relating to war and national defense, and current facts, such as that a cold war exists between the United States and communism. (Section 62, p. 36.) The topic "Judicial Notice" is also discussed at length in 21 Ohio Jurisprudence 2d beginning at page 35 and states that the rule may be stated broadly that courts will take judicial notice of whatever is commonly or generally known or ought to be generally known within the limits of their jurisdiction, for the court is presumed to know what is of common knowledge. (Section 16, p. 37.) State courts will take judicial notice of orders promulgated by departments of the federal government pursuant to acts of Congress. (Section 42, p. 57.)

The court, *In re Braier's Estate,* 305 N. Y. 148, 111 N. E. 2d 424, refused to allow distribution to a Hungarian legatee under a New York law which provided that where conditions are such that the legatee would not have benefit of payment, legacy should be deposited with New York City treasurer. In deciding the case the court relied on the conclusion of the United States Treasury Department that "local conditions in Hungary * * * are such that there is not a reasonable assurance that a payee in those areas will actually receive" payment. The court

pointed out that the federal enactment "seeks to check trading with the enemy and to stop such uses of foreign property rights as might imperil national defense, whereas" the New York law "aims to promote the basic obligation of courts of decedent devolution to effectuate a decedent's wishes respecting disposal of his assets on death by its application where the payment of a bequest to a person resident in a foreign country might be circumvented by partial or total confiscation." In *Estate of Markewitsh*, 62 N. J. Super. 407, 163 A. 2d 232, decided under a New Jersey statute which provided that where it appears that the next of kin would not have the benefit of or use or control of money due him, or where special circumstances make it appear desirable that such payment should be withheld, the court to whom fiduciary is accountable, on court's own motion, may direct that money be paid into court for benefit of next of kin. The court followed the determination of the Secretary of the Treasury which had determined that United States Treasury checks may not be sent to residents of various countries, including residents of the Union of Soviet Socialist Republics, for the reason that local conditions preclude assurance that the payee will receive the check and if he receives it will be able to negotiate it for its full value. Although, in another case, there was evidence that a Hungarian legatee would have the full benefit, use and control of moneys representing legacies, the court held it had a right to rely on the regulation of the Treasury Department. *In re Siegler's Will*, 132 N. Y. Supp. 2d 392, 284 App. Div. 436. *In re Wells' Estate*, 126 N. Y. Supp. 2d 441, 204 Misc. 975. In *Geffen's Estate*, 104 N. Y. Supp. 2d 490, 199 Misc. 756, the court held that "application for withdrawal of moneys on deposit with city treasurer would be refused with respect to share in estate of decedent to which resident of Lithuania was entitled, in view of fact that federal government through action of Treasury Department in concurrence with State Department had suspended all types of compensation and pension payments to beneficiaries in countries behind so-called 'Iron Curtain,' which affected area in Germany under control of Soviet Russia."

The court, in the *Estate of Frank Wozniak, Dec'd.*, 44 Luzerne Legal Register Reports 227 (Pa.), held that "it is the duty of the Orphans' Court to exercise the highest degree of care and caution to assure that funds of a deceased American

national be transmitted to his heir in a foreign country in such manner that the heir not only physicially receive the funds but be free to enjoy, use and control them, and also to make certain that the funds of American nationals do not go abroad to fall into Communist hands,'' and that ''the Orphans' Court will not turn over funds of a deceased American national for transmittal to an heir behind the 'Iron Curtain' of Poland, without any convincing assurance or guarantee that the decedent's heir will have the actual benefit, use, enjoyment or control of the funds, and that they will not be subject to confiscation in that country.'' In the case of *In re Url*, 7 N. J. Super. 455, the court held that where reasonable probability existed that Hungarian legatee would not have benefit or use or control thereof, executor would be directed to pay legacy to Surrogate for benefit of such legatee, next of kin, or person entitled thereto.

The court will take judicial notice that the countries mentioned in the Treasury Regulation are behind the so-called Iron Curtain. Whether or not the directive is applicable to public or private funds is irrelevant. The important factor is whether or not there is a reasonable assurance that a distributee will actually receive the moneys due from an estate. It is a matter of common knowledge that the Communist theory of government is entirely different from the theory of government operated in the free world, and particularly in the United States. The Communist plan is to dominate and rule the world. Common knowledge tells us that private ownership of property has been abolished in the Soviet Union, and its satellite nations, including Czechoslovakia. Land is the property of the government and personal property, including moneys, seems to be subject to confiscation, except for small amounts controlled by the government. *In re Klein's Estate,* 123 N. Y. Supp. 866, 203 Misc. 762.

The Surrogate's Court, *In re Getream's Estate,* 107 N. Y. Supp. 2d 225, where treasury department had ruled that delivery of checks to payees within Communist captive country be withheld because it could not be certain that payees would receive payment, would not authorize payment of distributive shares of deceased's estate to attorney-in-fact of Hungary nationals, but would withhold such funds, under a New York law similar to Section 2113.81, Revised Code, until such time as the court could be reasonably certain that funds would not be put to

142

use against the United States. The court (p. 226) stated that "concededly Hungary is one of the captive countries behind the iron curtain whose nationals are subject to those conditions of which the western world is well aware." The court also stated that "since Hungary is a member of this bloc of Communist captive countries, this court would consider sending money out of this country and into Hungary tantamount to putting funds within the grasp of the Communists." In the case of *In re Yee Yoke Ban's Estate*, 107 N. Y. Supp. 2d 221, the court held that in probate proceedings the court would take judicial notice of the fact that the mainland of China is controlled by a communist government.

The court, in *Sobko Estate*, 88 Penn. D. & C. Reps. 76, found that beneficiaries residing in the Union of Soviet Socialist Republics would not have the actual benefit, use or enjoyment or control of money or property distributed to them from a decedent's estate because (p. 77) "these unfortunate people have been enslaved by a vicious government which deprives them of many of the rights enjoyed by the free peoples of the world, including the fundamental right of private ownership of property," and "it is fairly to be inferred from this court's experience with other cases of this character that funds transmitted to citizens of these countries are confiscated or diverted by the state or its officials and fail to reach the intended beneficiaries." In *Zupko Estate*, 15 Penn. D. & C. Reps. 2d 442, the court also found that legatees in the Union of Socialist Soviet Republics would not receive the actual benefit or control of money or property distributed to them because (p. 448) the testator did not intend the legatees "to be used as pawns through whom the government of Russia would enrich itself at their expense so that they would receive little, if any, benefit" under the testator's will. "However," the court pointed out, "were his intent otherwise" the Pennsylvania Iron Curtain Statute, practically the same as Ohio's, "would serve as a bar to immediate distribution." The court also stated that the Iron Curtain statute has two purposes. The first, decedent devolution, but along with that is the prevention of the enrichment of foreign governments to the deprivation of distributees, especially those governments whose purposes are at variance with our own and who may employ such funds and property directly or indirectly for use

inimical to our country. In *Estate of Volencki*, 35 N. J. Super. 351, 114 A. 2d 26, the court under an Iron Curtain Statute withheld distribution of legacies to legatees residing in Hungary. The court (p. 27) stated that "a literal interpretation of the statute authorizes its use by the court without positive proof of the intended beneficiaries' lack of control. While none of the cases referred to establish the proposition that the statutory bridle may be based on judicial notice alone, it is felt that since nothing is taken away and all is preserved until the court receives convincing assurances that distributive shares will reach their proper destination, common knowledge of obstacles on the way should be sufficient. The spirit of the statute is a precautionary one; payment into court is interlocutory, and application for distribution to the beneficiaries may be renewed at any time."

It is common knowledge that private ownership of property has been abolished in the Union of Soviet Socialist Republics formerly known as Russia. *In re Landau's Estate,* 16 N. Y. Supp. 2d 3, 172 Misc. 651. Under New York law, the individual legatee or next of kin is made recipient of the inheritance, and it is not intended that a foreign government, of which the legatee or next of kin is a national, should be the object of testator's bounty, or that the right to succeed to property of New York decedent should be diverted from statutory next of kin to a foreign power. *In re Bold's Estate,* 18 N. Y. Supp. 2d 291, 173 Misc. 545. In *Danisch* v. *Guardian Life Insurance Co. of America,* 151 Fed. Supp. 17, in a case involving distribution of proceeds of an insurance policy, the court held that judicial notice can be taken of the fact that "general conditions prevailing in a Communist country (Poland) are a fundamental antithesis to those prevailing in United States is a matter of common knowledge."

In the case of *In re Estate of Porch,* 168 Ohio St. 362, a citizen of Hungary died intestate in 1956, at which time he was a resident of Toledo. The administrator of his estate filed a petition to determine heirship, which resulted in a finding that two brothers, a grandnephew and a grandniece, all of his next of kin, were residents of Hungary. Upon application of the administrator, the Probate Court of Lucas County ordered that the distributive shares of the heirs be deposited in

trust with the county treasurer. A power of attorney duly executed by each of the heirs in favor of an Ohio attorney was presented to the administrator. The attorney made application to the Probate Court for an order requiring the county treasurer to pay the money over to her. The Probate Court denied the application and held that under Section 2113.81, Revised Code, there was vested in the court the discretion to either retain in this country, in trust for the benefit of nonresident next of kin, or to grant the application of the attorney. The Probate Judge "felt that no money should go from this country to a point behind the Iron Curtain." The judgment of the Probate Court was affirmed by the Court of Appeal of Lucas County. The Supreme Court overruled a motion to certify the record.

The Court of Appeals of the First Appellate District of Ohio, in *Queen et al.* v. *Gastan et al.*, reviewed a case on appeal from the Probate Court of Hamilton County, which had been asked to decide if legatees residing in Czechoslovakia could receive legacies under a decedent's will which devised the residue of the decedent's estate to such legatees under the following provision: "All of the legatees mentioned in this item are now residents of Czecho-Slovakia and if, at the time of my death or within one year thereafter, the legacies can not, for any reason, be delivered to any or all of said legatees then such legacy or legacies that can not be delivered I give, devise and bequeath to my two nephews, Joseph Gastan and Stefan Gastan and Vincent Puskar, husband of my niece, equally, share and share alike. In such event it is my desire that they be ever mindful of aiding any of my relatives who do not benefit under this will." The Probate Court decided that "because of the laws of Czechoslovakia, a so-called iron curtain country, it was not possible for the executrices of Veronika Huncik's estate, at the time of her death on December 4, 1957, or within one year thereafter, *to deliver*, directly or through the agency of attorneys-in-fact, *the legacies to any or all of the Czechoslovakian legatees* named in the residuary clause of her will." The Court of Appeals, in affirming the Probate Court, held that "on the state of the record before it, the court below in finding that the legacies should be paid to the contingent domestic heirs rather than to the primary foreign heirs, was justified in resolving the factual situation

relative to the entitlement to the residue by the domestic heirs as provided in the judgment since its sole function was to determine the true intent of the testator on the basis of the evidence presented to it.''

The court will now consider if the next of kin, the distributees, of David Port, deceased, who reside in the Union of Soviet Socialist Republics, commonly known as Russia, will have the benefit or use or control of the money or other property due them from said decedent's estate.

From the evidence and from facts that may be regarded as forming part of the common knowledge of every person of ordinary understanding and intelligence, of which facts the court will take judicial knowledge, the court finds that Russia is conducting a relentless *cold war* against the United States and has created on its boundaries an *iron curtain* guarded by soldiers armed with machine guns isolating itself and its people from people and countries of the free world and withholding from the rest of the world by strict censorship and a completely controlled press information concerning its activities behind that iron curtain against other nations as well as against its own citizens.

In the Soviet Union all rights are considered an express grant by the government. The Soviet legal system does not recognize natural or inalienable rights; Soviet laws confer mere privileges upon citizens, and these privileges can arbitrarily be curtailed or withdrawn at any time.

The seriousness of the prolonged *cold war* is shown by the following carefully considered statements made by highest ranking officials of the United States: *President Harry S. Truman,* on January 8, 1951, in a State-of-the-Union Message, when the American soldiers were fighting a bitter campaign in Korea, stated that ''our men are fighting * * * because they know, as we do, that the aggression in Korea is part of the attempt of the Russian Communist dictatorship to take over the world, step by step.'' *President Dwight D. Eisenhower,* on January 13, 1961, in a State-of-the-Union Message, stated that ''the Communist movement throughout the world exploits the natural striving of all to be free and attempts to subjugate men rather than free them. These activities have caused and will continue to cause grave troubles in the world.'' *President John F. Ken-*

*nedy,* on January 30, 1961, in his first State-of-the-Union Message, stated that ''our greatest challenge is still the world that lies beyond the cold war, but the first great obstacle is still our relations with the Soviet Union and Communist China.'' *President Lyndon B. Johnson,* on April 20, 1963, in an address at the Associated Press Luncheon in New York, said ''first is our relationship with the Soviet Union, the center of our concern for peace, communists using force and intrigue, seeking to bring about a communist-dominated world. Our convictions, our interests, our life as a nation, demand that we resolutely oppose, with all of our might, that effort to dominate the world. This activity and this alone is the cause of the cold war between us.'' *J. Edgar Hoover, Director of the Federal Bureau of Investigation,* recently, as reported in the public press, said ''communism is a vast international conspiracy which today dominates one-third of the earth's people.''

Today the United States, in addition to the *cold war,* is engaged in a *military war* in Vietnam which is being fought by American troops against a regime aided and supported by Russia and other Communistic governments. There is a constant flow of war supplies from Russia to North Vietnam and the Viet Cong. American planes are being shot down by Russian-made jet fighters and missiles launched from Russian-made missile sites. As this opinion is being written, the Soviet Delegate (Nikolai T. Fedorenko) to the United Nations, in a speech to the General Assembly's main political committee, denounced United States policies and avowed further political and *military* support for Communist North Vietnam.

Russia is anxious to enlarge its gold supply, which can be done by the importation of American dollars from every available source.

At this point we feel obliged to interject the belief that peace-loving people and their leaders throughout the world still are fervently hoping that the Soviet leaders will dismantle their *iron curtain,* end the *cold war,* stop participating in *military wars,* and cooperate with other nations in helping to bring peace to a troubled world as we enter the space age. The government of the United States is engaged in a concerted diplomatic effort to end the Vietnam war on a peaceful basis.

While recognizing that there are no federal or state of Ohio

laws which directly prohibit the distribution of money or other property to next of kin, legatees, distributees, or beneficiaries not residing within the United States or its territories, even if they live in Russia which presently is waging a *cold war* and indirectly assisting in the waging of a *military war* in Vietnam against the United States, we believe that the evidence and facts show that circumstances prevailing in Russia at the present time will prevent the next of kin of David Port, deceased, and the distributees of his estate in Russia from having the benefit or use or control of David Port's money or property, for the following reasons:

(1) The transfer of property to a Russian legatee, distributee, or beneficiary from an Ohio decedent's estate must be effected through the Russian National Bank of Foreign Trade in Moscow in which bank United States dollars are converted into Russian rubles at an arbitrary exchange rate fixed by that governmental controlled bank and because of Russia's secret policies behind the *iron curtain* it is impossible for the court to ascertain from the evidence, which was in conflict, how much benefit or use or control Russian distributees will have of the Port estate's property or money (American dollars) paid to them in substituted Russian rubles.

(2) The Secretary of the Treasury, under federal law, has determined banking facilities in general or local conditions in the Union of Soviet Socialist Republics are such that there is not a reasonable assurance that a payee in those areas will actually receive checks or warrants drawn against funds of the United States, or agencies or instrumentalities thereof, and be able to negotiate the same for full value. The court is particularly impressed by this regulation because all of the money and property in David Port's estate came from the United States Veterans' Bureau. Furthermore, the court recognizes the fact that an agency of the United States government is in a better position than the court to determine if payees in Russia will actually receive checks or warrants drawn against funds of the United States. We are unable to draw a practical distinction between a "payee" in Russia actually receiving a check or warrant drawn against funds of the United States and a "distributee" in Russia having the "benefit or use or control" of money or other property due him from an estate.

(3) The court is also impressed by the position, supported by the evidence, which has been taken by the First National Bank, now administrator of (and formerly, for twenty-three years before his death, guardian of) the estate of David Port, deceased, that none of the assets of the decedent's estate should be transferred at the present time to Russian distributees because "under the currency exchange rates presently existing in Russia, any heirs residing in Russia would get, at the very most, only a minimal fraction of the value of the residue of this estate." The First National Bank, the testimony shows, has had extensive experience in matters relating to foreign exchange in other countries including Russia and other "iron curtain" countries.

(4) There is a strong probability that the Russian government will confiscate through the device of converting valuable American dollars at an arbitrary exchange rate into less valuable Russian rubles which may or may not be distributed to the Russian distributees who are entitled to receive the money or other property from David Port's estate, with the result that the Russian government, and not the distributees, will have the benefit or use or control of the money or other property and use it in *cold* and *military* wars against the United States.

Since distributees of the estate of David Port, deceased, will not at the present time have the benefit or use or control of the money or other property due them because of circumstances now prevailing in Russia, where they reside, the court will direct that such money or other property be delivered by the plaintiff, the First National Bank of Cincinnati, as administrator of the estate of David Port, deceased, to itself, if it will accept the trust, as trustee, to be administered by it for the benefit of said distributees or such persons who may hereafter be entitled thereto until such time as the persons entitled to said money or other property satisfy the probate court of their right to receive it as provided in Sections 2113.81 and 2113.82, Revised Code.

*Judgment accordingly.*